ATTORNEY GENERAL, *ex rel.* OPTOMETRY
BOARD OF EXAMINERS, *v.* PETERSON.

SAME *v.* SMEELINK.

DISSENTING OPINION.

T. M. KAVANAGH and ADAMS, JJ.

1. PHYSICIANS AND SURGEONS — PRACTICE OF OPTOMETRY — DEFINI-
TION—STATUTE.
   *The practice of optometry as defined by statute includes either
   the examination of the human eye for contact lenses or the
   fitting or insertion of contact lenses to the eye (CLS 1961,
   § 338.257).*

2. SAME—OPTOMETRY—UNLICENSED PRACTICE—VERDICTS AND FIND-
INGS.
   *Findings of trial judge that all but one of the defendants were
   engaged in unlicensed practice of optometry are sustained by
   record where evidence disclosed that defendants, though un-
   licensed to practice optometry, were engaged in the fitting of
   contact lenses (CLS 1961, § 338.257).*

3. EQUITY—INJUNCTION—CRIMINAL PENALTY.
   *Equity has no criminal jurisdiction except by express statutory
   authorization and persons may not be enjoined solely on the
   ground that their acts or omissions will constitute violations
   of law and are punishable as crimes.*

---

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 6] 41 Am Jur, Physicians and Surgeons § 28.
   What constitutes practice of "optometry". 88 ALR2d 1290.
[3] 27 Am Jur 2d, Equity § 57.
[4] 27 Am Jur 2d, Equity § 57; 42 Am Jur 2d, Injunctions §§ 69,
   70, 80, 157, 239.
[5] 42 Am Jur 2d, Injunctions §§ 157, 160; 39 Am Jur, Nuisances
   §§ 153–162.
[7, 11–13] 42 Am Jur 2d, Injunctions §§ 157, 160, 239; 39 Am Jur,
   Nuisances §§ 153–162; 41 Am Jur, Physicians and Surgeons § 28.
[8] 42 Am Jur 2d, Injunctions § 352.
[9] 31 Am Jur 2d, Expert and Opinion Evidence §§ 181, 183, 184.
[10] 5 Am Jur 2d, Appeal and Error § 1009.

(445)

4. Same—Injunction—Private Parties.

Equity will intervene by injunction in actions by private persons to prevent deprivation of personal or property rights through interference, injury, or destruction by unlawful acts; the injunction so issued is designed to protect individual rights from damage, and it in no way interferes with or undertakes the enforcement of criminal laws.

5. Same—Injunction—Public Nuisance.

Equity may exercise its jurisdiction to abate public nuisances affecting health, morals, or safety or to protect a public property right or interest; thus, if the unlicensed practice of a profession can be shown to constitute a public nuisance, it may be enjoined.

6. Physicians and Surgeons—Public Health—Optometry Act—Police Power.

The optometry act bears a reasonable relation to the public health and is proper exercise of the police power (CL 1948 and CLS 1961, § 338.251 et seq.).

7. Same—Equity—Injunction—Public Nuisance—Violation of Statute.

Violations of optometry statute, containing criminal penalties that have not been pursued and containing no provision for injunction, held, insufficient to establish a public nuisance meriting the invocation of equity jurisdiction, where only proof of injury was that one patient lost a day of work because the contact lenses fitted by one defendant aggravated her eyes and caused them to be swollen (CLS 1961, § 338.257).

8. Appeal and Error—De Novo Review—Injunction.

The Supreme Court reviews de novo on record presented in action for injunction, since it is a chancery case.

9. Physicians and Surgeons—Optometry—Opinion Testimony.

Opinion testimony for defendant opticians in actions to enjoin them from examining and measuring eyes of persons for contact lenses and from fitting, inserting, and adjusting such lenses held, as convincing, if not more so, than opinion testimony for plaintiff board of optometry (CLS 1961, § 338.257).

10. Costs—Public Question—Injunction—Unlicensed Practice of Optometry.

No costs are awarded on appeal in action seeking injunction against unlicensed practice of optometry, a public question being involved.

OPINION OF THE COURT.

11. EQUITY—JURISDICTION—INJUNCTION—UNLICENSED PRACTICE OF OPTOMETRY.

    A court of equity may enjoin the unlicensed practice of a profession such as optometry since acts in violation of a valid statute enacted to preserve public health, safety, and welfare constitute a public nuisance from which harm to the public is presumed to flow (CL 1948 and CLS 1961, § 338.251 *et seq.*).

12. ATTORNEY GENERAL—PARTIES—PUBLIC NUISANCE.

    The attorney general, acting on behalf of the people, is a proper party to bring an action to abate a public nuisance or restrain unlawful acts which constitute a public nuisance.

13. EQUITY—JURISDICTION—INJUNCTION—CRIMINAL PENALTIES.

    The existence of a criminal or other penalty for the practice of a profession without a license will not oust equity from jurisdiction to enjoin such unlawful acts.

Appeals from Court of Appeals, Division 3, Burns, P. J., and Fitzgerald, J., affirming Kent, Vander Ploeg (Claude), J. Submitted June 11, 1968. (Calendar No. 2, Docket Nos. 51,662, 51,663.) Decided February 3, 1969.

4 Mich App 612, affirmed.

Complaints by Frank J. Kelley, Attorney General of the State of Michigan, on the relation of Michigan Board of Examiners in Optometry, to enjoin Martin C. Peterson and Forrest W. Sattler, doing business as the Optical House, and Joseph H. Smeelink, Judson L. Smeelink, Esther L. Smeelink, and Smeelink Optical Service, Inc., a Michigan corporation, from examining persons' eyes for the purpose of fitting contact lenses without the supervision of a licensed optometrist, oculist, or ophthalmologist. Permanent injunction granted. Defendants ap-

pealed to the Court of Appeals. Affirmed. Defendants appeal. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Joseph B. Bilitzke* and *Maurice M. Moule,* Assistant Attorneys General, for the plaintiff.

*Woodrow A. Yared,* for defendants Peterson and Sattler.

*Wierenga & Sevensma,* for defendants Smeelink and Smeelink Optical Service, Inc.

ADAMS, J. (*dissenting*). On September 28, 1962 the attorney general filed bills of complaint in these consolidated cases alleging that defendants, opticians, "did wrongfully and unlawfully practice the profession of optometry * * * in that they did diagnose, examine and measure the eyes of certain persons for contact lenses, and did fit, insert, and adjust the said contact lenses to the eyes of these said persons." The bills were amended to allege the acts constituted a continuing nuisance affecting the public health and welfare for which the criminal remedy provided by the optometry act was inadequate. Permanent injunction issued November 9, 1964.[1]

---

[1] In granting the permanent injunctions, the trial court found:

"Defendants have admitted that for a period of years prior to the said preliminary injunction they measured the eyes of persons for contact lenses with a keratometer or ophthalmometer without supervision of a licensed optometrist, oculist, or ophthalmologist.

"The defendants for a period of years prior to said preliminary injunction inserted, fitted, and adjusted contact lenses in the eyes of persons without the supervision of a licensed optometrist, oculist, or ophthalmologist, and gave advice to persons as to whether they can wear contact lenses.

"After a patient had been examined by an ophthalmologist for a nominal fee, the patient dealt solely with the defendants in regard to the manufacture, measuring, fitting, and adjustment of the con-

The Court of Appeals affirmed (1966), 4 Mich App 612.

The optometry act (PA 1909, No 71, as amended) was amended by PA 1961, No 113, to include in the definition of the practice of optometry:

"The practice of optometry is hereby defined as being either 1 or any combination or part of the following:  *  *  *
"(d) The examination of the human eye for contact lenses and the fitting or insertion of contact lenses to the eye."   CLS 1961, § 338.257 (Stat Ann 1968 Cum Supp § 14.647).

The finding of the trial judge of violations of the act is amply sustained by the record in these cases.

Section 9 of the optometry act prescribes a criminal penalty as follows:

"Any person violating any of the provisions of this act shall be deemed guilty of misdemeanor, and upon conviction thereof shall be punished by

---

tact lenses; and the defendants received the entire purchase price for the contact lenses.

"Testimony established that the following steps are required in the process of supplying contact lenses to an individual wearer:

"(a) Advice whether the patient can or should use contact lenses.

"(b) Refraction for visual acuity.

"(c) Determination of size, degree of roundness, type of bevel, and other characteristics of a lens other than refractive index.

"(d) Manufacture based on information supplied to manufacturer as to refractive index and factors of size, degree of roundness, bevel, et cetera.

"(e) Fitting, adjusting, and readjustment.

"Expert testimony was that:

"(a) There is a reasonable relation between the public health and welfare and the requirement of the optometry act with respect to contact lenses.

"(b) A person's eyes could be damaged by untrained persons inserting contact lenses and this would not be eliminated by supervision by a licensed physician.

"(c) People do not have the same corneal curve of the eye and a prescription for framed glasses is not finite, but would have to be converted for contact lenses.

"(d) Measuring for, inserting, and fitting contact lenses is a professional and not a technical function and requires professional judgment."

a fine of not more than 300 dollars or imprisonment in the county jail, not to exceed 4 months, or by both such fine and imprisonment in the discretion of the court." CL 1948, § 338.259 (Stat Ann 1956 Rev § 14.649).

Appellants contend:

1. Assuming they are guilty of violating the optometry act, the attorney general is not entitled to injunctive relief because the statute provides a criminal remedy and does not provide for injunctive relief.

2. The optometry act authorizes an optician to fabricate, insert, and fit contact lenses upon the prescription and under the supervision of a doctor of medicine. This second contention will not be discussed because we do not consider it to be before us upon the record in these cases.

## 1. The Law as to Equitable Relief.

### (a) Criminal Jurisdiction in Equity.

Under ordinary circumstances, a complete and adequate remedy for the violation of criminal statutes and municipal ordinances is afforded by courts of law through criminal prosecution. In Michigan, except by express statutory authorization, equity has no criminal jurisdiction. The doctrine of "criminal equity" is not recognized. Persons will not be enjoined solely on the ground that their acts or omissions will constitute violations of law and are punishable as crimes.

· Chief Justice Dethmers stated in *Village of Port Austin* v. *Parsons* (1957), 349 Mich 629, 630, 631:

"It will be noted that the ordinance contains no provision for its enforcement by injunction. It is not claimed that it was adopted under authority of any enabling statute containing such provision. The

only legal compulsion to compliance is the penal clause of the ordinance. Plaintiff's bill of complaint pleads the bare conclusion 'that such structure would also be a nuisance.' Defendant's answer denies it. This amounts neither to proper averment by plaintiff of facts showing nuisance nor admission thereof by defendant. The mere fact that the structure, as undertaken to be built by defendant, is prohibited by ordinance does not make it a nuisance. There were no proofs of nuisance, public or private, nor of interference with property rights. Thus, there being neither statutorily conferred jurisdiction nor that which is inherent in the courts to abate a nuisance or enjoin violation of property rights, the court was without jurisdiction in the premises."

To like effect, see *United-Detroit Theaters Corp.* v. *Colonial Theatrical Enterprise, Inc.* (1937), 280 Mich 425, and *Township of Warren* v. *Raymond* (1939), 291 Mich 426. In *Glover* v. *Malloska* (1927), 238 Mich 216, 220, it was said: "Of course, equity has no inherent jurisdiction to restrain the commission of criminal acts".

(*b*) *Equitable Relief as Between Private Persons.*
Nevertheless, it is well-settled that equity will intervene by injunction in actions by private persons to prevent deprivation of personal or property rights through interference, injury, or destruction by unlawful acts or where the acts are of a criminal nature. In such cases, the injunction issues for the purpose of protecting individual rights from damage and it in no way interferes with or undertakes the enforcement of criminal laws. See *Glover* v. *Malloska, supra,* and *Gilligham* v. *Ray* (1909), 157 Mich 488.

In *Seifert* v. *Buhl Optical Co.* (1936), 276 Mich 692, three individual registered optometrists and the Michigan Society of Optometrists (not a State agency) sued on behalf of themselves and the reg-

istered members of their profession. They were held to have sufficient property interest to entitle them to enjoin an optical company from engaging in certain unlawful advertising relating to eye examinations and the cost of glasses. The Court said (p 700):

"Suit may be brought by *parties engaged* in a profession or business to enjoin unfair trade and practice which would be injurious to their interests and the fact that such practices are punishable by criminal penalties is immaterial." (Emphasis added.)

This Court has also approved the use of injunctions to enjoin activities by nonlicensed persons amounting to the illegal practice of the law. See *Grand Rapids Bar Association* v. *Denkema* (1939), 290 Mich 56; *Ingham County Bar Association* v. *Walter Neller Company* (1955), 342 Mich 214 (53 ALR2d 777); *State Bar of Michigan* v. *Kupris* (1962), 366 Mich 688. In these cases, the question of criminal punishment or of the adequacy of a legal remedy was not raised. The opinions center on the question of what does constitute the illegal practice of the law.

In *United-Detroit Theaters Corp.* v. *Colonial Theatrical Enterprise, Inc., supra,* this Court denied injunctive relief in the absence of evidence that defendant's lottery scheme affected the plaintiff's business.

In *Plassey* v. *S. Loewenstein & Son* (1951), 330 Mich 525, this Court upheld dismissal of a bill for injunctive relief to restrain the defendant from erecting and operating a slaughterhouse in the vicinity of plaintiffs' apartment buildings on the ground that private persons are not proper plaintiffs in a suit to abate a public nuisance but said (p 530):

"It may be noted that if the construction of a building for an avowed purpose would unquestionably result in a nuisance affecting the rights of individuals, a case might be presented wherein private individuals whose rights would unquestionably be invaded thereby might have the erection of the building itself enjoined."

So much for the injunctive claims of private litigants.

(c) *Equitable Relief to Public Officials or Agencies.*

Is the rule different where the plaintiff is a governmental unit, agency, or officer? The Court of Appeals, in affirming the trial court (4 Mich App 612), found that equity does have jurisdiction to issue injunctions in such cases, stating (p 616):

"In our opinion this case falls in the category of cases set forth in *Dearborn National Insurance Company* v. *Commissioner of Insurance* (1950), 329 Mich 107, where the Court stated on pp 118, 119:

" 'We do not agree with appellants that under the circumstances of this case the authority of the commissioner must be found solely in said section, or that equity has no jurisdiction under these circumstances on the ground that said section is a penal statute, enforcement of which must rest solely in an arrest and conviction for a misdemeanor. The existence of a penal provision in a statute or an ordinance does not necessarily have the effect of ousting the chancery court of jurisdiction, where prosecution does not afford an adequate remedy. *People, ex rel. Secretary of State,* v. *State Insurance Company* [1869], 19 Mich 392; *Board of Health of the City of Grand Rapids* v. *Vink* [1915], 184 Mich 688; *Township of Warren* v. *Raymond* [1939], 291 Mich 426. The remedy provided by said section—prosecution of an officer or director for a misdemeanor, does not afford an adequate remedy for the protection of the policyholders or

creditors of the appellant insurance companies, or of the public. Equity has jurisdiction, under the circumstances of this case.' "

*People, ex rel. Secretary of State,* v. *State Insurance Company* (1869), 19 Mich 392, was an application for writ of mandamus to compel an insurance company to open its books to the State for examination. It was held that the writ was properly granted, since if the secretary of State was left (p 396) "to the slow process of *quo warranto* or criminal prosecution, the whole purpose of this section may be defeated."

*Board of Health of the City of Grand Rapids* v. *Vink* (1915), 184 Mich 688, was an action to enjoin the defendant from collecting garbage in the city of Grand Rapids contrary to an ordinance of the city regulating such collection. The Court, while recognizing the rule that (p 694) "*usually* courts of equity will not interfere and enjoin the breach of a penal ordinance", found the defendant's method of collection constituted a public nuisance (the defendant's garbage collection was a threat to health) and that the city by contract with an authorized collector had a direct financial interest in the garbage collection. The injunction was properly issued.

*Township of Warren* v. *Raymond* (1939), 291 Mich 426, held that the business of wrecking automobiles and of salvaging parts is not a public or a private nuisance *per se* and that a court of equity was *without* jurisdiction to enforce an ordinance which provided for the licensing of such operations and a fine or imprisonment but which contained no provision for its enforcement by injunction.

*Dearborn National Insurance Company* v. *Commissioner of Insurance, supra,* followed the earlier *State Insurance Company Case* in holding that because the insurance business is affected with a pub-

lic interest, an insurance company can be compelled by a court of equity to dispose of an unlawfully held stock interest notwithstanding the statute provided for criminal prosecution of individual officers and directors. The remedy by penal enforcement of the statute was held inadequate for the protection of policyholders, creditors, and the public.

In addition to the above cases which were considered by the Court of Appeals, in the case of *Village of St. Johns* v. *McFarlan* (1875), 33 Mich 72, the village sought to restrain the defendant from erecting a wooden building within established fire limits contrary to the provisions of a village ordinance. This Court denied relief, saying (pp 73, 74):

"A court in chancery has no jurisdiction to restrain the threatened violation of a village ordinance, unless the act threatened to be done, if carried out, would be a nuisance.    *    *    *

"The erection of a wooden building within the limits of a city or village is not in and of itself a nuisance. Neither does the fact that the erection of such is prohibited by ordinance make it a nuisance.    *    *    *    If a proper ordinance was framed with an appropriate penalty for all violations of its provisions, we think the remedy at law would be found adequate."

In *Portage Township* v. *Full Salvation Union* (1947), 318 Mich 693, it was held that a camp meeting conducted by an ecclesiastical corporation was an unauthorized use of premises under a township zoning ordinance. The sanitation requirements of the ordinance had not been complied with and there was such a degree of noise as to cause disturbance until 4 a.m. A statute specifically declared that buildings erected or converted to uses in violation of township zoning ordinances were nuisances *per se*. This Court affirmed the issuance of an injunction.

In *Village of Port Austin* v. *Parsons* (1957), 349 Mich 629, it was held that a bill, which pleaded the bare conclusion that the structure being erected would be a nuisance, to enjoin violation of an ordinance relating to setback lines did not constitute a proper showing. The mere erection of the building in violation of the ordinance did not make it a nuisance. There was no attempt to confer equity jurisdiction by statute or ordinance nor was there proof that either a public or private nuisance existed.

In *Township of Farmington* v. *Scott* (1965), 374 Mich 536, this Court gave recognition to equity jurisdiction where the defendant's operation of a swimming pool supply business on residential property was contrary to the township zoning ordinance. Such jurisdiction was found from the existence of an abatable nuisance asserted to be such by reference to a statute.

In *State, ex rel. Washtenaw County Prosecuting Attorney*, v. *Western Union Telegraph Company* (1953), 336 Mich 84, this Court reversed and set aside an order of the trial court granting a temporary injunction pursuant to a bill of complaint to abate a nuisance upon allegations that defendant was receiving and transmitting money in Michigan to be placed on bets outside of the State. After commenting that the allegations in the bill that the defendant aided gambling or entered into gambling conspiracies did not establish a nuisance under the statute, Chief Justice Dethmers wrote (p 90):

"Nor is plaintiff aided by such allegations if, perchance, they effectually charge the commission of crimes by defendant inasmuch as equity will not, independent of the element of nuisance or interference with the property or pecuniary rights of another, enjoin the commission of a crime."

It may be concluded that, while courts of equity will not customarily interfere to prevent the breach of a penal ordinance or statute, they may exercise equity jurisdiction to abate public nuisances affecting health, morals, or safety, or to protect a public property right or interest. Consequently, I agree with the statement in Chief Justice T. E. BRENNAN's opinion that "equity *may* enjoin the unlicensed practice of a profession." (Emphasis added.) I disagree with the conclusion that this is a proper case for the exercise of such authority.

The optometry act bears a reasonable relation to the public health and is a proper exercise of the police power. *Sanchick* v. *State Board of Optometry* (1955), 342 Mich 555. However, the board of optometry, proceeding through the attorney general, does not claim an interference by the defendants with its property or pecuniary rights or those of the State. The Board's claim is that the conduct of the defendants constitutes a continuing nuisance affecting the public health and welfare for which the criminal remedy under the act is inadequate.

## 2. The Facts.

It is important to keep in mind that the defendants involved in this appeal are not identical. In the first case, Attorney General, *ex rel.* Michigan Board of Optometry, *v.* Martin C. Peterson, et al, Martin C. Peterson is eliminated from any consideration of eye injury resulting from fitting or wearing contact lenses since the record is clear that he had nothing to do with this part of the business. He testified that he never participated in contact lens work. The remaining defendant in this case is Sattler.

Karen MacDonald, a girl of 18 years of age, whose father objected to her wearing contact lenses and

who was never told of her having them until the
following year, went to Dr. Mehney. She obtained
a prescription for glasses from Dr. Mehney who sent
her to defendant Sattler. She went to Sattler 40
to 45 times over a period of about a year. Sattler
gave her 10 or 11 pairs of lenses to wear which were
never comfortable. She quit Sattler and switched
to Dr. Paton. At the time of trial she was wearing
contact lenses furnished by him. She testified she
had a great deal of tearing with Sattler lenses.
There is no testimony by Karen MacDonald of in-
jury to her eyes from the fitting or wearing of the
various pairs of lenses furnished by Sattler.

Evelyn Brisbin obtained a prescription for con-
tact lenses from Dr. Van Portfliet. In connection
with the fitting of contact lenses by defendant Sat-
tler, she went back to him about 8 or 10 times be-
cause the lenses felt uncomfortable. She said the
first set of lenses were too strong and that the lenses
would aggravate the eye and that at one time her
eye was swollen and she lost a day of work.

Sally Dean Pastoor testified that Dr. Van Port-
fliet gave her a prescription for contact lenses and
that the lenses furnished by Mr. Sattler were un-
comfortable. She gave up trying to wear them and
got another set of lenses from Dr. Zost which were
O.K.

Connie Vander Veen testified that she had ob-
tained her contact lenses originally from a doctor
in Lafayette, Indiana. She went to Mr. Sattler be-
cause the lenses were filming over. She returned
a second time and Sattler ground down the left lens
which she later lost because it was too loose. She
quit Sattler without obtaining a replacement lens
from him.

Roberta Walsh testified that Sattler obtained her
prescription for contact lenses from Dr. Mehney's

office. She had about nine appointments with Sattler and was having trouble in wearing the contact lenses. She got a second set of lenses which were no better. She gave up trying and got a partial refund of the amount she paid Sattler.

Of the testimony by the five witnesses produced in the case against Peterson and Sattler, only one witness, Evelyn Brisbin, gave any statement or made any claim that could be construed as an eye injury. She said that her eye was swollen and that she lost a day of work.

In the second case against Joseph H. Smeelink, Esther Smeelink and Judson L. Smeelink, doing business as Smeelink Optical Service, the Smeelink Optical Service, Inc., was later substituted as defendant.

Finkbeiner, a member of the State Police, was solicited to contact the Smeelink organization and represent that he wanted to be examined for contact lenses. He obtained a prescription for contact lenses from Dr. Doran. David Vander Ark, defendant's employee, examined and measured the eyes of Finkbeiner for contact lenses. Subsequently, Judson L. Smeelink inserted and adjusted contact lenses to the eyes of Finkbeiner and examined his eyes to determine how the contact lenses were fitting. Finkbeiner tried wearing the lenses in the Smeelink office and when he left he took them with him. There was no testimony of injury to the eyes by Finkbeiner. He is the only witness for the plaintiff in the case against the Smeelink Optical Service, Inc.

Dr. Leon E. Firestone, a licensed optometrist, provided expert testimony as follows:

"*A.* Well, the very intimate relationship between the contact lens and the eye is such that it is easy to injure or insult or abrade that eye, and, there-

fore, in all degrees of fitting, one has to have a background in the various parts of the eye, and be knowledgeable about it so they do not abrade it, or they do not injure it.

"*Q.* In your opinion, could a person's eye be damaged by an unlicensed person fitting and inserting contact lenses?

"*Mr. Sevensma:* Just a moment. I object to that as being immaterial. It is not a question whether you are licensed or unlicensed. That isn't the point.

"*The Court:* I will sustain the objection.

"*Q. (By Mr. Moule):* In your opinion, doctor, could one that was not trained in the fitting and inserting of contact lenses, and who was not licensed so to do, could he be a hazard if he attempted to fit these lenses?

"*Mr. Sevensma:* Just a moment, Doctor. I object to that, your honor, I object to the portion where he mentioned not licensed. I think that, again, is immaterial. If he wants to ask could one not trained in the fitting or insertion of contact lenses cause injury to the eye, that would be proper, not where he includes the portion, not licensed. That would be immaterial and beside the point.

"*The Court:* On the basis of the testimony so far, I will sustain the objection. You may ask the other portion.

"*Q. (By Mr. Moule):* In your opinion, could a person who had not been trained to examine and fit and prescribe for contact lenses, and insert contact lenses, cause damage to the human eye?

"*A.* Yes, he could.

"*Q.* Now, on what do you base that opinion?

"*A.* Well, I base that opinion, many times, for example, a patient will feel comfortable wearing his contact lens, and, yet, actually, that lens is irritating that eye; and that patient may go a whole day and say he is very comfortable, and wake up in the middle of the night with a horribly, with horrible pain, so, therefore, you cannot depend upon the judgment or

subjective symptoms. The doctor, or the examiner, must be on guard, and watch over a period of time, and, therefore, he has to exercise professional judgment. Actually, one could fit a contact lens, and the patient would feel perfectly comfortable, and it could be a very horrible fit.

"Q. In your opinion, could one who was trained in a course for contact lenses that covered a period of 5 days be properly trained to fit these on the public without danger to the public?

"A. I do not believe so. I think in order to properly fit contact lenses, one should have an academic background in physiology, anatomy, pathology, geometrical objects, and the various subjects. After that, he might be trained in the mechanical act of the fitting, but he would have no basis for judgment or proper judgment unless he did have a background in the academic and clinical sciences, so I don't believe you could go through those subjects in 5 days."

Optometrist Gordon Deur provided additional expert testimony:

"A. The very fact that when fitting a contact lens, it is fitted on the eye, and if it is improperly fitted, can cause serious damage to the eye and to vision itself. Therefore, for the protection of the public, I feel that it is necessary that the people know who the personnel are who are, have been qualified or trained in this type of work, and this is the reason why it involves the public welfare of the State of Michigan.

"Q. And in your opinion, could a person's eyes be damaged by a lay person who would be fitting and inserting contact lenses?

"A. Yes, I believe it could.

"Q. And on what do you base that opinion?

"A. Because of the fact that there are so many varied factors in fitting a contact lens. Whether or not that lens will fit properly will depend not only on the power, but, it will depend on all the specifications required to fit a lens, such as size, di-

ameter of the lens, the thickness of the lens, the lid tension. These are factors which will control the fact whether or not the lens will fit properly, and whether it will later on cause some type of defect, injury."

Dr. Robert Van Sluyters, also an optometrist, gave like opinion testimony. This concluded the case for the plaintiff.

The defendants produced Dr. Harold F. Falls, an ophthalmologist, a professor of ophthalmology at the University of Michigan Medical Center, a teacher and lecturer on ophthalmology, and author of many articles on the subject. He testified that in fitting contact lenses there are four essential steps and that "the fourth step is so-called mechanical fitting, and this, I think, any lay person can do, thoroughly trained, and under adequate supervision. I, therefore, feel that a lay individual without medical background can perform the No. 4 step." He stated:

"Q. Doctor, at the University of Michigan Medical Center, do you use opticians in fitting and inserting of contact lenses?
"A. We do, indeed.
"Q. And in the use of the keratometer?
"A. And in the use of the keratometer."

Dr. James L. Frey, M.D., a specialist in ophthalmology practicing in Detroit, testified:

"I certainly think that it is an established practice to have the doctor perform the original examination, and to make the decision that this patient should have contact lens, and then to give this patient a prescription to be taken to the optician, who, then, performs the technical work of fitting the lens to the patient's eye, and then the doctor, following this patient, subsequently in his office, again, to determine whether this fit has been satisfactorily produced."

And again:

"*Q.* Doctor, the optician, you say, teaches and instructs the patient in the insertion, fitting, of the contact lens to the eye?

"*A.* Yes.

"*Q.* About how long does that take the optician to teach the patient, any patient any age?

"*A.* Well, of course, this will vary from patient to patient. I suppose some people could learn this in 30 or 40 minutes. Probably, in my office, my nurse will spend on the average of an hour, but then there is an occasional patient who has fears or other troubles which might make it a 2 or 3 hour proposition to do, not very often. I would say an hour, on the average, would get most people to have the lens able to get it in and out with safety and assurance.

"*Q.* There are some patients that just can never learn to wear contact lens?

"*A.* Yes."

Dr. Luebert Docter, M.D., an ophthalmologist practicing in Grand Rapids, who had an arrangement with Smeelink Optical Service for fitting, inserting and training of patients relative to contact lenses, testified:

"*Q.* Has the arrangement that you have made based on this letter and your instructions, permitted you to more efficiently perform the professional functions of a doctor of ophthalmology?

"*A.* Yes, it has.

"*Q.* Had you not made this arrangement whereby the technical aspects of contact lens fitting were handled by Mr. Smeelink as a trained optician, you had to do that yourself, would that have prevented you from rendering proper service to your patients and to the public at large?

"*A.* It would have prevented me from rendering as much service to as many patients, yes."

Dr. Paul Van Portfliet, M.D., a specialist in ophthalmology in Grand Rapids, testified:

"*Q.* Doctor, what, in your opinion, is the effect of this team-approach between yourself as an ophthalmologist and an optician, namely, Mr. Sattler, as far as the welfare of the patient is concerned?

"*A.* Well, my own feeling is that it is a very satisfactory, in fact, I think the most satisfactory approach to the fitting of contact lenses.

"*Q.* And why?

"*A.* Because this individual, if he has any medical problem with his contact lenses, has an immediate individual to turn to for help, his ophthalmologist.

"*Q.* In other words, this optician is an extension of your hand, as the physician, is that correct?

"*A.* For certain technical fitting procedures, correct."

All of the lay witnesses for the plaintiff who obtained contact lenses, it will be recalled, had obtained prescriptions from an M.D. before they went to one of the defendants to secure their lenses.

While the optometrists testified that the actions of the opticians might cause injury, the testimony of the medical doctors was that their actions were beneficial. Since this is a case in chancery, we review *de novo* on the record presented. The opinion testimony for the defendants is as convincing, if not more so, than that for plaintiff.

It was the legislature's prerogative to set the standards for licensing and practice and to prescribe the penalties for violations in what is admittedly a sensitive area of health. In the optometry act or amendments thereto, the legislature has never provided for the issuance of injunctions as was done in the dentistry act (PA 1939, No 122) by the 1961 amendment adding section 20a. PA 1961, No 198 (CLS 1961, § 338.220a, Stat Ann 1968 Cum Supp

§ 14.629[20.1]).  See, also, *Federal Gravel Company*
v. *Detroit & Mackinac R. Co.* (1929), 248 Mich 49,
where this Court considered the statutorily con-
ferred injunctive remedy in an action to enjoin dis-
crimination in freight rates.

Proof of a statutory violation of a regulatory
statute that bears a reasonable relation to the public
health and welfare, where such statute contains
criminal penalties that have not been pursued, where
no injunctive remedy has been statutorily conferred,
and where injury to the public by such violation or
violations has not been made out, is insufficient to
establish a public nuisance meriting the invocation
of equity jurisdiction.

The case should be reversed and remanded for
further proceedings in accordance with this opinion.
No costs, a public question being involved.

T. M. KAVANAGH, J., concurred with ADAMS, J.

T. E. BRENNAN, C. J.  This case presents the ques-
tion of whether a court of equity should enjoin the
unlicensed practice of a profession.

The question is novel in this State.  Authorities
gathered in 81 ALR 292 and 92 ALR 173 show that
opinions of other courts are divided.

We believe the better rule and the trend of mod-
ern authority is that equity may enjoin the un-
licensed practice of a profession.

At common law, acts in violation of law constitute
a public nuisance.  Harm to the public is presumed
to flow from the violation of a valid statute enacted
to preserve public health, safety and welfare.*  The
attorney general, acting on behalf of the people, is
a proper party to bring an action to abate a public

---

\* See CL 1948 and CLS 1961, § 338.251 *et seq.* (Stat Ann 1956 Rev
and Stat Ann 1965 Cum Supp § 14.641 *et seq.*).—REPORTER,

nuisance or restrain unlawful acts which constitute a public nuisance. The existence of a criminal or other penalty for the practice of a profession without a license will not oust equity from jurisdiction. *In re Debs* (1895), 158 US 564 (15 S Ct 900, 39 L Ed 1092).

Our Court has enjoined the unauthorized practice of law. *Grand Rapids Bar Association* v. *Denkema* (1939), 290 Mich 56. We have restrained the unlicensed collection of garbage. *Board of Health of the City of Grand Rapids* v. *Vink* (1915), 184 Mich 688. We should now affirm this trial court's injunction against the unlicensed practice of optometry.

DETHMERS, KELLY, and BLACK, JJ., concurred with T. E. BRENNAN, C. J.

T. G. KAVANAGH, J., took no part in the decision of this case.