STATE *ex rel* WAYNE COUNTY PROSECUTING ATTORNEY v LEVENBURG

STATE *ex rel* WAYNE COUNTY PROSECUTING ATTORNEY v RICHMOND

Docket Nos. 59756, 60478. Argued October 5, 1978 (Calendar Nos. 11, 12).—Decided July 3, 1979. On motion for rehearing, appeal as to *Levenburg* remanded to the Court of Appeals for consideration of issues raised in that Court but not addressed in its opinion; rehearing denied as to *Richmond,* September 27, 1979. See 407 Mich 1147, 1148.

The State of Michigan, on the relation of the Wayne County Prosecuting Attorney, brought an action to abate a nuisance under the "red light abatement act" against Harry Levenburg, Anderson's Gardens, Inc., the bar which Levenburg owned in Detroit, and Albert Porvin, who was a co-owner with Levenburg of the building in which Anderson's Gardens operated. The Wayne Circuit Court, Blair Moody, Jr., J., granted a judgment for the plaintiff that Anderson's Gardens would be closed as a public nuisance for one year, but that the bar could be reopened after four months upon certain conditions. The Court of Appeals, Bronson, P.J., and Bashara and Horn, JJ., reversed on the grounds that there was no evidence that Anderson's Gardens was a house of prostitution or that any sexual acts for hire had occurred on the premises, and that the trial court erred in deciding that the red light abatement act applied to Anderson's Gardens as a place which prostitutes used for accosting and soliciting but in which no acts of sexual intercourse took place (Docket No. 27487). Plaintiff appeals.

The State of Michigan, on the relation of the Wayne County Prosecuting Attorney, brought an action to abate a nuisance under the "red light abatement act" against George Richmond and Evelyn Richmond, the owners of the Willis Show Bar in

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 5, 8] 63 Am Jur 2d, Prostitution §§ 1, 2.
[2] 73 Am Jur 2d, Statutes § 145.
[3, 12] 73 Am Jur 2d, Statutes § 206.
[4] 73 Am Jur 2d, Prostitution § 12.
[6] 24 Am Jur 2d, Disorderly Houses §§ 1, 2.
[7] 24 Am Jur 2d, Disorderly Houses § 2.
[9, 10] 24 Am Jur 2d, Disorderly Houses § 43.
[11] 24 Am Jur 2d, Disorderly Houses §§ 37-47.
  63 Am Jur 2d, Prostitution § 2.

Detroit. The Wayne Circuit Court, James Montante, J., denied the defendants' motion for summary judgment. The Court of Appeals, Bashara, P.J., and Beasley, J. (Quinn, J., dissenting), reversed on the ground that the plaintiff made no allegation that acts of sexual intercourse occurred in the Willis Show Bar but relied on allegations that prostitutes used the place for accosting and soliciting (Docket No. 29110). Plaintiff appeals.

In an opinion by Justice Ryan, with Chief Justice Coleman and Justices Williams and Fitzgerald concurring, it was *held:*

Proof that numerous instances of accosting and soliciting for purposes of prostitution occurred at certain places is sufficient to sustain a finding that such places constitute a public nuisance subject to abatement under the red light abatement act.

1. The Court has recently decided that the red light abatement act does not apply to motion picture theatres showing obscene films. The dictum in that case that the statute was intended to apply to houses of prostitution and that lewdness and assignation are both synonymous with prostitution is not controlling in these cases.

2. In order to determine whether accosting and soliciting for purposes of prostitution constitute prohibited conduct under the abatement act, one must focus on the meaning of the statutory term "assignation", rather than on the term "lewdness", and determine whether "assignation" is synonymous with the statutory term "prostitution". The rules of statutory construction require that effect be given, if possible, to every word, sentence and section. If the term "assignation" has a meaning distinct from the term "prostitution", effect must be given to that meaning in order to effectuate the Legislature's intention.

3. "Assignation" is not statutorily defined nor is there any Michigan precedent which authoritatively defines the term. The Legislature has directed that all words used in statutes shall be construed according to common and approved usage of the language. The term "assignation" as it is commonly used means an appointment for a meeting, especially for illicit sexual relations. The term assignation as used in the abatement act encompasses instances of accosting and soliciting for purposes of prostitution because they involve the making of an appointment for the purpose of prostitution. Limiting this definition to the making of an appointment *for the purpose of prostitution* is consistent with the apparent legislative intent to eliminate the use of property in connection with prostitution,

avoids prohibiting innocent conduct which is of the nature of assignation, and is consistent with the rule of *noscitur a sociis*.

Reversed.

Justice Kavanagh, joined by Justice Levin, dissented. He wrote:

1. The red light abatement act is directed to the abatement of lewdness, assignation, or prostitution, and the terms "lewdness, assignation, and prostitution" are synonymous. The abatement statute has been held to apply to houses of prostitution and not to motion picture theatres where sexual acts are not committed but are portrayed on the screen.

2. The plaintiff argues that a "house of prostitution" is not only a place where sexual acts are committed, but should be defined to be a "disorderly house", which includes bawdy-houses, common gaming-houses, and similar places to which people promiscuously resort for purposes injurious to the public morals, health, convenience, or safety. A house of prostitution, or bawdy-house, is a disorderly house, but not all disorderly houses are houses of prostitution. A house of prostitution is one in which a prostitute plies her trade. Prostitution, the trade of the prostitute, commonly refers to the performance of sexual acts for compensation. Soliciting and accosting, and prostitution itself are different and distinct concepts. In order to constitute a "house of prostitution" a place must be one in which sexual acts are committed for compensation. Places where soliciting and accosting but no sexual acts occur are not houses of prostitution and cannot be closed pursuant to the nuisance abatement statute.

3. The plaintiff also argues that, despite previous judicial construction of the nuisance abatement act, "lewdness" should not be limited to the meaning of the term prostitution but should be construed to comprehend the activities of accosting and soliciting because they are inextricably associated with prostitution and are cognate activities to which the nuisance abatement statute should properly be applied. This argument misperceives the nature of "cognate" activities. The cognate activities which could properly be embraced would have to be sexual acts of some sort. "Lewdness" refers to the general class of activities normally associated with houses of prostitution, or whatever such establishments may be called. The term is intended to designate and prohibit sexual acts which are performed for compensation. Solicitation for purposes of prostitution is not covered under the rubric of "lewdness", because it is not a sexual act. At most, solicitation is the *offer* to perform a sexual act for compensation. Establishments used to solicit or

offer to perform elsewhere the acts covered by the nuisance abatement statute cannot be closed pursuant to that statute. The abatement statute applies only to houses of prostitution, assignation or lewdness, as places where sexual acts are committed.

Justice Levin also wrote separately to respond to the opinion of the Court. In reaching its result, the Court overlooks its earlier decisions, which point to a different result, and places an untenable construction on the word "assignation".

1. The Court's conclusion that a place of business open to the public may be padlocked because patrons, without encouragement of the proprietor and on their own initiative, there engage in activity ancillary to the statutorily condemned activities of sex for money, illegal use of alcoholic beverages, or gambling—such as offering or agreeing to go elsewhere to engage in the proscribed activity—is not compatible with the history of disposition under the padlock statute. The cases appear to fall into two general categories: the first where the condemned activity is engaged in solely by a person in lawful possession of the property, and the second where unlawful activity is engaged in by patrons of what, except for that activity, is generally a lawful business. Where the claim made is in the first category there is no need to prove knowledge or participation by the owner of the property sought to be seized or padlocked. Where, however, it is sought to padlock a legitimate business because of the activities of the patrons, the Court has required proof of knowledge and some degree of participation by the owner in condemned activity by patrons *on his premises*. It is unprecedented to padlock a public place based on ancillary activity of patrons less than the completed offense condemned by the padlock act.

2. The Court announces an untenable definition of the term "place of assignation". To be sure, the terms "lewdness", "assignation", and "prostitution" have differing meanings. The history of the red light abatement acts, however, sustains the consistent construction in this and other jurisdictions that the acts were designed to abate nuisances at houses or places where sexual acts occur; such abatement acts have been applied solely to commercial sexual activity. Even if that history is ignored, place of assignation cannot properly be read to mean the place where the agreement is made rather than the place where the meeting is to occur. The dictionary definitions cited by the Court do not support its conclusion. "An appointment for a meeting" is the "time and place" where the meeting is to occur; the Court apparently reads "an appoint*ment* of

time and place" as if it were "appoint*ing* a time and place", concluding that the "*making* of an appointment" is itself an assignation. Where the agreement appoints another place for the sexual act, that place alone is the place of assignation; the mere agreement is not an assignation. In apparent appreciation that its strained construction may invite application in contexts other than offering sex for money, the Court turns full circle, acknowledges that the legislative purpose was to abate the use of premises and places for prostitution, and creatively limits "assignation" to agreements involving prostitution to avoid the prohibition of "innocent" conduct which is "of the nature of assignation".

3. Since the Court does not rest decision on the clause "kept for the use of prostitutes or other disorderly persons", and the trial judge made no finding that Anderson's Gardens was kept for such use and the record does not show that the owners were themselves involved directly or through their employees in providing the illicit supply to their customers, there is no need to consider this part of the statute in a dissenting opinion.

Justice Blair Moody, Jr., did not participate in the decision of these cases.

75 Mich App 90; 254 NW2d 797 (1977) reversed.

77 Mich App 41; 257 NW2d 759 (1977) reversed.

OPINION OF THE COURT

1. NUISANCE — PROSTITUTION — ABATEMENT — SOLICITING — ACCOSTING — WORDS AND PHRASES.

Whether accosting and soliciting for purposes of prostitution constitute prohibited conduct under the public nuisance statute depends on the meaning of the statutory term "assignation", rather than the term "lewdness", and whether "assignation" is synonymous with the statutory term "prostitution" (MCL 600.3801; MSA 27A.3801).

2. STATUTES — CONSTRUCTION — WORDS AND PHRASES.

The primary rule governing the interpretation of statutes is to ascertain and give effect to the intention of the Legislature; in this process effect must be given, if possible, to every word, sentence and section.

3. STATUTES — CONSTRUCTION — WORDS AND PHRASES.

The Legislature has provided that all words used in statutes shall be construed according to common and approved usage (MCL 8.3a; MSA 2.212[1]).

4. Nuisance — Prostitution — Abatement — Soliciting — Accosting — Words and Phrases.

The term "assignation" as it is commonly used means an appointment for a meeting, especially for illicit sexual relations, and as it is used in the public nuisance statute includes acts of accosting and soliciting because they involve making an appointment for the purpose of prostitution (MCL 600.3801; MSA 27A.3801).

Dissenting Opinion by Kavanagh, J.

5. Nuisance — Prostitution — Abatement — Words and Phrases.

*The public nuisance statute is directed to the abatement of "lewdness", "assignation", or "prostitution", which are synonymous terms (MCL 600.3801; MSA 27A.3801).*

6. Prostitution — Disorderly House — Words and Phrases.

*A "house of prostitution" is one in which a prostitute plies her trade, while a "disorderly house" includes bawdy-houses, common gaming-houses, and similar places to which people promiscuously resort for purposes injurious to the public morals, health, convenience, or safety; therefore, a house of prostitution, or bawdy-house, is a disorderly house, but not all disorderly houses are houses of prostitution.*

7. Nuisance — Prostitution — Soliciting — Accosting.

*Establishments used to accost or solicit persons to perform sexual acts elsewhere are not houses of prostitution and cannot be closed pursuant to the nuisance abatement statute; in order to constitute a house of prostitution a place must be one in which sexual acts are committed for compensation (MCL 600.3801; MSA 27A.3801).*

8. Prostitution — Solicitation — Lewdness — Words and Phrases.

*Solicitation for purposes of prostitution is not covered under the rubric of "lewdness" because it is not a sexual act; the term refers to the general class of activities normally associated with houses of prostitution and is intended to designate and prohibit sexual acts of whatever nature which are performed for compensation.*

See headnotes 5-8.

9. NUISANCE — ABATEMENT — PROSTITUTION — INTOXICATING LIQUORS — GAMBLING.

   *A conclusion that a place of business open to the public may be padlocked because patrons, without encouragement of the proprietor and on their own initiative, there engage in activities ancillary to the activities condemned by the public nuisance abatement statute of sex for money, illegal use of alcoholic beverages or gambling—such as offering or agreeing to go elsewhere to engage in the condemned activity—is not compatible with the history of disposition under the abatement statute (MCL 600.3801; MSA 27A.3801).*

10. NUISANCE — ABATEMENT — KNOWLEDGE.

   *Proof of knowledge of the owner of a legitimate business and some degree of participation by the owner in condemned activity by patrons on his premises is required to padlock the business under the public nuisance abatement statute because of the activities of patrons (MCL 600.3801; MSA 27A.3801).*

11. NUISANCE — ABATEMENT — PROSTITUTION — STATUTES.

   *The history of the red light abatement acts sustains the consistent construction that the acts were designed to abate nuisances at houses or places where sexual acts occur; such abatement acts have been applied solely to commercial sexual activity (MCL 600.3801; MSA 27A.3801).*

12. NUISANCE — ABATEMENT — ASSIGNATION — WORDS AND PHRASES.

   *One cannot properly read "place of assignation" in the nuisance abatement statute to mean the place where the agreement for an assignation is made rather than the place where the agreed-upon meeting for the agreed-upon purpose is to occur; even if the term is not limited by the consistent construction of red-light abatement statutes, as a matter of ordinary English usage it means the place of the appointment for sexual purposes, not the place where the appointment is made (MCL 600.3801; MSA 27A.3801).*

*William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,.* Principal Attorney, Appeals, and *Maura D. Corrigan,* Assistant Prosecuting Attorney, for plaintiff.

*Hyman, Gurwin, Nachman, Friedman & Winkelman* (by *Abba I. Friedman)* and *Grant, Schon,*

*Wise & Grant* for defendants Levenburg and Anderson's Gardens, Inc.

*Allen & Tendler* and *Norman L. Zemke* for defendants Richmond.

RYAN, J. *(to reverse).* We granted leave in these consolidated cases to decide whether proof that numerous instances of accosting and soliciting for purposes of prostitution occurred at certain places is sufficient to sustain a finding that such places constitute a public nuisance subject to abatement under MCL 600.3801; MSA 27A.3801 (hereafter, abatement act). We hold that it is and reverse the Court of Appeals.[1]

The pertinent facts of these proceedings can be found in Justice KAVANAGH's opinion. We write separately because we do not agree with his analysis of the law applicable to these cases.

Justice KAVANAGH finds that this Court's recent decision, *State ex rel Wayne County Prosecutor v Diversified Theatrical Corp,* 396 Mich 244; 240 NW2d 460 (1976), strictly limits the application of the abatement act to houses of prostitution, assignation or lewdness where sexual acts are committed. We do not agree, and read that decision as standing solely for the proposition that motion picture theatres may not be enjoined from showing obscene films under the abatement act.

---

[1] We note that leave was granted in these cases for the limited purpose of deciding this issue. However, we acknowledge that a judgment for abatement in a prosecution of this nature cannot be rendered without a finding of knowledge of the accosting and soliciting on the part of the owners or operators of the place found to be a nuisance and their acquiescence in those activities.

Such a finding was made by the trial judge in the *Levenburg* case. No such finding has yet been made in the *Richmond* case because the trial has not yet taken place. The *Richmond* case is before us on an appeal from a denial of defendant's motion for summary judgment.

MCL 600.3801; MSA 27A.3801 provides in pertinent part:

> "*Any building,* vehicle, boat, aircraft *or place used for the purpose of lewdness, assignation or prostitution* or gambling, *or used by,* or kept for the use of *prostitutes* or other disorderly persons, * * * is hereby declared a nuisance and * * * shall be enjoined and abated as hereinafter provided, and as provided in the court rules. Any person, or his servant, agent or employee who shall own, lease, conduct or maintain any building, vehicle or place used for any of the purposes or by any of the persons above set forth or where any of the acts above enumerated are conducted, permitted or carried on, is guilty of a nuisance." (Emphasis supplied.)

The difficulty in interpreting the meaning of the statutory phrase, "lewdness, assignation or prostitution" as used in this act, and determining its applicability to the facts before us, stems from dictum in *Diversified* which states that this statute "* * * was intended to apply to houses of prostitution * * *"[2] and that lewdness and assignation are both synonymous with prostitution.[3] We do not accept this dictum as controlling these cases.

*Diversified* involved an attempt to apply the abatement act to motion picture theatres showing obscene films. The opinion held that the statute was not intended to apply to motion picture theatres where sexual acts are not committed but are portrayed on the screen. In reaching that decision the Court reviewed decisions of other jurisdictions involving apparently similar statutes to determine whether "obscenity" fell within the purview of the statutory phrase "lewdness, assignation or prostitution", and found it did not. In the course of its

[2] 396 Mich 244, 246; 240 NW2d 460 (1976).
[3] 396 Mich 244, 249; 240 NW2d 460 (1976).

review, which appears to have focused primarily on whether obscenity is lewdness, the Court quoted an Illinois appellate court decision which stated that lewdness could not be equated with obscenity, but must be synonymous with prostitution, when the former term was found in a statute prohibiting the use of premises for the purpose of lewdness, assignation or prostitution. In addition, the Illinois court stated, after noting other possible, innocent definitions of assignation, that this term also was synonymous with prostitution.[4]

We find that, in order to determine whether instances of accosting and soliciting for purposes of prostitution constitute prohibited conduct under MCL 600.3801; MSA 27A.3801, we must focus on the meaning of the statutory term "assignation", rather than focusing on the term "lewdness" as Justice KAVANAGH does, and determine whether assignation is synonymous with the statutory term "prostitution".

In seeking to determine the definition of the statutory term "assignation", we note that this Court has long recognized that the primary rule governing the interpretation of statutes is to ascertain and give effect to the intention of the Legislature and that in this process, "effect must be given, if possible, to every word, sentence and section". *Grand Rapids v Crocker,* 219 Mich 178, 182; 189 NW 221 (1922). Consequently, if the term "assignation" has a meaning distinct from the term "prostitution", we must give effect to that

---

[4] 396 Mich 244, 249; 240 NW2d 460 (1976), citing *People v Goldman,* 7 Ill App 3d 253; 287 NE2d 177, 178-179 (1972). *Goldman* involved an unsuccessful attempt to abate the display and dissemination of pornography and the promotion of a "Swingers Club" pursuant to a statute prohibiting the use of all buildings and places for the purposes of lewdness, assignation or prostitution. The opinion does not indicate that any accosting and soliciting occurred on the premises.

meaning in order to effectuate the Legislature's intention in enacting this statute.[5]

Assignation is not statutorily defined, and a review of Michigan case law has disclosed no precedent which has finally and authoritatively defined that term. We read the definition of this term found in *Diversified* as dictum and hold it does not control the instant cases which do not involve the showing of obscene films but do involve conduct substantially connected with prostitution.

Because we find no statutory definition or controlling judicial definition of this term, we comply with the legislative directive to construe words used in statutes according to common and approved usage,[6] and look to the common meaning of the term "assignation" to resolve the question before us.

*Webster's Third New International Dictionary Unabridged* (1966 ed), p 132, defines assignation as "an appointment of time and place for a meeting [especially] for illicit sexual relations".

*The Random House Dictionary of the English Language: The Unabridged Edition* (1969 ed), p 90, defines the term as "an appointment for a meeting, [especially] a lover's secret rendezvous; a lover's tryst".

Finally, the term "assignation" is given the following definition in 6A CJS, Assignation, p 582:

"The word is defined as meaning an appointment of time and place for meeting or interview; used chiefly of love interviews and now commonly in a bad sense."

---

[5] See *People ex rel Wayne Prosecuting Attorney v Sill*, 310 Mich 570, 575; 17 NW2d 756 (1945), as cited in *Diversified*, 396 Mich 244, 248; 240 NW2d 460 (1976), where this Court acknowledged that one of the purposes of this statute is to effectively eliminate the use of property, real or personal, in connection with prostitution.

[6] MCL 8.3a; MSA 2.212(1).

Consistent with these definitions, we find that the term assignation as used in the abatement act encompasses instances of accosting and soliciting for purposes of prostitution because such instances involve the making of an appointment for the purpose of prostitution.[7] We find that limiting this definition to the making of an appointment *for the purpose of prostitution* is consistent with the apparent legislative intent to eliminate the use of property in connection with prostitution; avoids prohibiting innocent conduct which is of the nature of assignation; and is consistent with the rule of *noscitur a sociis.* [8]

---

[7] We note that this definition has been accepted by lower appellate courts in other jurisdictions.

In *Garrison v Menendez,* 158 So 2d 856, 859 (La App, 1963), *writ refused* 245 La 643; 160 So 2d 229 (1964), the court found that solicitation for prostitution was an activity included in the ordinarily understood dictionary definition of assignation.

In *State v Baldino,* 11 NJ Super 158; 78 A2d 95 (1951), the court noted, in dictum, that while defendant could not be convicted of maintaining a place for the purpose of prostitution when it was shown no illicit sexual acts were performed on his premises, he might have been indicted for maintaining a house of assignation due to the use of his establishment for facilitating of appointments for indulgence in illicit sexual intercourse.

Finally, the court in *People v Bayside Land Co,* 48 Cal App 257; 191 P 994 (1920), appeared to accept the trial court finding that no acts of prostitution or assignation were actually committed on certain premises where acts of sexual intercourse were solicited while finding these activities were still prohibited as falling within the term "lewdness". Yet the court proceeded to use the term "assignation" in a manner that can only be understood to be consistent with the meaning we give this term today when it said:

"It appears from the record that a party of some nine persons, among whom were the investigators from the office of the district attorney, were at the Tower Cafe (the premises involved in this suit) and while there *made an assignation to repair to the other place where rooms might be obtained,* and where, as stated by one of the women, 'they could have a real party.' Pursuant to *the assignation made on the premises,* they did go to the Seal Inn, and there rented rooms, and some of them indulged in lewd acts. Probably the court admitted this testimony for the purpose of ascertaining whether or not the purpose of *the assignation so made* was consummated." (Emphasis supplied.)

[8] *Noscitur a sociis* is defined in Black's Law Dictionary (4th ed), p 1209, to mean:

The judgment of the Court of Appeals is reversed and the decision of the trial court reinstated in each of these cases.

COLEMAN, C.J., and WILLIAMS and FITZGERALD, JJ., concurred with RYAN, J.

KAVANAGH, J. *(for affirmance).* The question in these consolidated cases is whether proof that soliciting and accosting occurred on the premises is sufficient to regulate a place as a public nuisance under the "red light abatement act", MCL 600.3801; MSA 27A.3801.[1] The trial court in each case held that it is, and the Court of Appeals reversed. We affirm the Court of Appeals.

Each cause was commenced upon a complaint filed by the Wayne County Prosecutor's office. A lengthy trial was held in *Levenburg*. There was testimony that prostitutes frequented Anderson's Gardens, a bar located in the City of Detroit, and solicited sexual acts to be performed elsewhere. The trial court made findings of fact that within 30 days prior to the filing of the complaint, soliciting and accosting had occurred on the premises. The court also found that during the period from January 1, 1971 to July 1, 1974, over 160 arrests for soliciting and accosting on the premises were made. Based on these findings, the trial court found Anderson's Gardens to be a place used by

---

"It is known from its associates. * * * The meaning of a word is or may be known from the accompanying words.

"The doctrine means that general and specific words are associated with and take color from each other, restricting general words to sense analogous to less general." (Citations omitted.)

[1] The statute provides in part:

"Any building, vehicle, boat, aircraft or place used for the purpose of lewdness, assignation or prostitution or gambling, or used by, or kept for the use of prostitutes or other disorderly persons, * * * is hereby declared a nuisance and * * * shall be enjoined and abated as hereinafter provided, and as provided in the court rules."

prostitutes and used for the purpose of assignation, and thus subject to abatement under the statute. The court permanently enjoined the defendants from permitting the bar to be used for the purpose of assignation.

On appeal, the Court of Appeals reversed. The trial court's interpretation of " 'assignation' as including the making of an appointment for purposes of prostitution, and thus including the act of soliciting for prostitution" was held to be erroneous. 75 Mich App 90, 93; 254 NW2d 797 (1977). Relying on this Court's opinion in *State ex rel Wayne County Prosecutor v Diversified Theatrical Corp*, 396 Mich 244; 240 NW2d 460 (1976), the Court held that the premises must be a house of prostitution in order for the abatement act to be applied properly, and a bar wherein no sexual acts for profit occur is not such a place.

*Richmond* involves an appeal from the trial court's denial of defendant's motion for summary judgment. The defendant argued in support of the motion that the Willis Show Bar, holder of a Class C liquor license, is not a "house of prostitution" as the term was used in *Diversified, supra.* The trial court rejected the argument, finding the act applicable to places where acts of soliciting and accosting occur. A majority of the Court of Appeals reversed, holding "the Willis Show Bar is not a house of prostitution". 77 Mich App 41, 45; 257 NW2d 759 (1977).

In *Diversified, supra,* this Court addressed the scope of the abatement statute in the course of determining the question of whether the statute was intended to apply to motion picture theatres exhibiting obscene movies. Citing several decisions in other states,[2] we found that the statute is

---

[2] See *People v Goldman,* 7 Ill App 3d 253; 287 NE2d 177 (1972);

" 'directed to the abatement of * * * houses of lewdness, assignation, or prostitution' ", and that the terms "lewdness, assignation, and prostitution" are synonymous. 396 Mich 248-249. Accordingly, we held that the abatement statute "was intended to apply to *houses of prostitution* and not motion picture theatres *where sexual acts are not committed* but are portrayed on the screen". 396 Mich 246 (emphasis added).

Appellant now urges us to give a narrow reading to the *Diversified* opinion, and apply the abatement act to bars where sexual acts are not committed but are solicited for performance elsewhere. Two basic arguments are advanced in support. It is asserted that a "house of prostitution" is not limited to premises where sexual acts are committed. Rather, the term should be defined broadly and equated with the definition of a "disorderly house" found in *People v Thrine,* 218 Mich 687, 691; 188 NW 405 (1922):

" 'A disorderly house, in its restricted sense, is a house in which people abide, or to which they resort, disturbing the repose of the neighborhood; but in its more enlarged sense it includes bawdy-houses, common gaming-houses, and places of like character, to which people promiscuously resort for purposes injurious to the public morals, or health, or convenience, or safety. Nor is it essential that there be any disorder or disturbance in the sense that it disturbs the public peace or the quiet of the neighborhood. It is enough that the acts there done are contrary to law and subversive of public morals, and the result is the same whether the unlawful acts are denounced by the common law or by statute.' "[3]

*State, ex rel Murphy v Morley,* 63 NM 267; 317 P2d 317 (1957); *State, ex rel Carroll v Gatter,* 43 Wash 2d 153; 260 P2d 360 (1953); *State, ex rel English v Fanning* 97 Neb 224; 149 NW 413 (1914).

[3] Appellant has not proceeded in either *Levenburg* or *Richmond* on the theory that these bars are nuisances under common law. See

As is apparent from this definition, a house of prostitution, or bawdy-house, is a disorderly house, but not all disorderly houses are houses of prostitution. *"A house of prostitution* is one in which a prostitute plies her trade".˙73 CJS, Prostitution, § 1, p 226. Prostitution, the trade of the prostitute, commonly refers to the performance of sexual acts for compensation. Soliciting and accosting and prostitution itself are different and distinct concepts, MCL 750.448; MSA 28.703.[4] Recognizing the distinction customarily drawn, the Alabama Court of Criminal Appeals recently held a complaint alleging the defendant "did prostitute herself by making an offer to indiscriminate lewdness" did not charge prostitution, *Holloway v Birmingham,* 55 Ala App 568; 317 So 2d 535 (Ct Crim App, 1975), *cert den* 294 Ala 759; 317 So 2d 541 (1975). The Court stated, 55 Ala App 574:

"Here appellant *made a solicitation to perform* a natural and an unnatural sex act for a named sum of money. The proposition got no further than that. There was no bedroom affair, no disrobing, no touching of the bodies, no money paid, and no sexual activity. In short, *the crime of prostitution was not committed."* (Emphasis added.)

We hold that in order to constitute a "house of prostitution" a place must be one in which sexual

---

*Attorney General, ex rel Optometry Board of Examiners v Peterson,* 381 Mich 445; 164 NW2d 43 (1969); *Dearborn National Ins Co v Comm'r of Ins,* 329 Mich 107; 44 NW2d 892 (1950).

[4] MCL 750.448; MSA 28.703 prohibits soliciting and accosting. It provides:

"Any person, male or female, 17 years of age or older, *who shall accost, solicit or invite another* in any public place, or in or from any building or vehicle, by word, gesture or any other means, *to commit prostitution* or to do any other lewd or immoral act, shall be guilty of a misdemeanor." (Emphasis added.)

acts are committed for compensation. Premises where soliciting and accosting but no sexual acts occur are not houses of prostitution and cannot be closed pursuant to the abatement statute.

Appellant also argues that limiting the applicability of the abatement statute to houses of prostitution, and requiring that sexual acts occur on the premises, ignores the effect the Legislature intended to give the terms "lewdness" and "assignation".

These terms are not defined in the statute. In *Diversified* we ascribed to those words a meaning we found "clear in light of the history and purpose of these [abatement] statutes". 396 Mich 250. Citing *State, ex rel Murphy v Morley,* 63 NM 267; 317 P2d 317 (1957), we said that the statutory term " 'lewdness', applies only to acts of assignation or prostitution".[5] 396 Mich 248-249. Similarly, in accordance with the rule of *noscitur a sociis,* we

---

[5] This definition of "lewdness" avoids the vagueness problems noted in *Chicago v Cecola,* 56 Ill App 3d 143, 148-149; 371 NE2d 955, 959 (1978):

"Upon initial inspection, the word 'lewdness' appears to be vague and indefinite. In *Miami Health Studios, Inc v Miami Beach,* 353 F Supp 593 (SD Fla, 1972), the court found that a similar statute prohibiting the maintenance or operation of any place for the purpose of lewdness, assignation, or prostitution was constitutionally infirm as the language employed was too vague and indefinite, and failed to inform reasonable men as to what conduct was prohibited. However, in *People v Goldman,* 7 Ill App 3d 253; 287 NE2d 177 (1972), the Illinois appellate court observed that lewdness as used in the Illinois public nuisance act, which is quite similar to section 192-1 of the Municipal Code of Chicago, was in the disjunctive seriatim with the words 'prostitution and assignation,' so that its meaning must be determined by looking to the words with which it is associated. The court concluded that the legislature must have intended 'lewdness' to be interpreted as being synonymous with 'prostitution,' and therefore held that the statute was not too vague. (Accord, *Chicago v Geraci,* 30 Ill App 3d 699; 332 NE2d 487 [1975].) In *Geraci,* the court adopted the same interpretation with respect to section 192-1 of the Municipal Code of Chicago. We agree with this interpretation."

See, also, *State ex rel Faches v NDD, Inc,* 228 NW2d 191 (Iowa, 1975) (holding the term "lewdness", undefined in the Iowa abatement statute, to be vague).

read both "lewdness" and "assignation" as being synonymous with prostitution.

Appellant claims that, despite the definition in *Diversified,* "lewdness" cannot be wholly limited by the meaning of the term "prostitution". Rather, lewdness should be given a meaning which comprehends the activity of soliciting and accosting. It is argued that solicitation is inextricably associated with prostitution and is a cognate activity[6] to which the abatement statute should properly be applied.

We disagree, for we are satisfied that such argument misperceives the nature of "cognate" activities. The cognate activities which could properly be embraced would have to be sexual acts of some sort.

In *Chicago v Geraci,* 30 Ill App 699; 332 NE2d 487 (1975), an Illinois appellate court reached the question of whether a masturbatory massage parlor is a house of prostitution under the Illinois abatement statute. In determining that it was, the court assigned the following interpretation to the term "lewdness", 30 Ill App 3d 704:

"Although traditionally the term 'lewdness' is viewed as being broader than and including the term 'prostitution,' *(People v Lackaye,* 348 Ill App 542; 109 NE2d 390

---

[6] Appellant's argument is based on the following language used by the court in *Goldman,* fn 2 *supra,* 255, and quoted in *Diversified,* 396 Mich 249:

"'To fix purpose, we must read text in context and if a word is known by the company it keeps, then "lewdness" is synonymous with prostitution. This aid contemplates that where two or more words of analogous meaning are employed together in a statute, they are understood to be used in their cognate sense, to express the same relations, and give color and expression to each other. For example, an "assignation" could be an innocent appointment, a chaste tryst, or a rendezvous (even with destiny), at least those are meanings that can be so ascribed to it, but not here in its context with "lewdness" and "prostitution". Thus "assignation", a euphemism coined years ago. to protect the hypersensitive, is synonymous with "prostitution." ' "

[1952]; *opinion adopted by Illinois Supreme Court,* 1 Ill 2d 618; 116 NE2d 359 [1953]) *such terms refer to the same general class of activities which are normally associated with houses of prostitution* (or whatever such establishments may be called). *They are intended to designate and prohibit sex acts of whatever nature which are performed for money."* (Emphasis added.)

Solicitation for purposes of prostitution is not covered under the rubric of "lewdness", as it is not a sexual act. At most, solicitation is the offer to perform a sexual act for compensation. Establishments used to solicit or offer to perform elsewhere the acts covered by the statute cannot be closed pursuant to it. See *State ex rel Washtenaw County Prosecuting Attorney v Western Union Telegraph Co,* 336 Mich 84; 57 NW2d 537 (1953).

In accordance with our opinion in *Diversified,* we hold that the abatement statute applies only to houses of prostitution, assignation or lewdness, as places where sexual acts are committed.

The Court of Appeals is affirmed.

LEVIN, J., concurred with KAVANAGH, J.

LEVIN, J. *(dissenting).* I agree with Justice KAVANAGH, for the reasons stated in his opinion, that the Court of Appeals should be affirmed. I write separately to respond to the opinion of the Court.

In reaching a result expressing sensitivity to a particular societal concern, the Court overlooks its earlier decisions, which point to a different result, and places an untenable construction on the word "assignation".

I

The Court's conclusion that a place of business open to the public may be padlocked because

patrons, without encouragement of the proprietor and on their own initiative, there engage in activity ancillary to the statutorily condemned activities of sex for money, illegal use of alcoholic beverages or gambling—such as offering or agreeing to go elsewhere to engage in the condemned activity—is not compatible with the history of disposition under the padlock statute.

Of the many early cases, the only one cited by the Court is *Sill*. [1] Its dictum, in responding to a title-object argument, that the purpose of the statute is "to eliminate effectively" the "use of property" *"in connection with* gambling, prostitution, and illicit sale of liquor, *et cetera"* is a construction of the padlock statute which the dissenters in *Western Union* [2] would have placed on it. The majority ruled, however, that *Sill* and other cases *(Tate* and *Bitonti* [3]*),* which sustained the seizure and sale of automobiles used to run numbers or mutuel betting tickets although no completed acts of gambling were shown to have occurred in them, did not announce a comprehensive rule permitting padlocking on proof of ancillary activity facilitating or effectuating but not amounting to the condemned activity.[4]

---

[1] *People ex rel Wayne Prosecuting Attorney v Sill,* 310 Mich 570, 575; 17 NW2d 756 (1945).

[2] *State ex rel Washtenaw County Prosecuting Attorney v Western Union Telegraph Co,* 336 Mich 84, 97; 57 NW2d 537 (1953).

[3] *People ex rel Wayne Prosecuting Attorney v Bitonti,* 306 Mich 115, 118-119, 123; 10 NW2d 329 (1943); *People ex rel Wayne Prosecuting Attorney v Tate,* 306 Mich 667; 11 NW2d 282 (1943).

Similarly, see *State ex rel Wayne Prosecuting Attorney v Martin,* 314 Mich 317; 22 NW2d 381 (1946).

[4] The language from *Sill* (see accompanying text between fns 1 and 2) paraphrased in fn 5 of the opinion of the Court in the instant case was in response to the argument that the act was constitutionally defective in embracing more than one object, Const 1908, art 5, § 21. The defendant did not, as here, argue that the act did not apply to ancillary activities facilitating an offense condemned in the padlock act.

The argument of the dissenters in *Western Union* was:

"We have heretofore properly and by necessary inference construed and applied this statute as to the meaning of the phrase, 'used for the purpose of,' as including acts and uses of property before effectuation of the forbidden purpose.

\* \* \*

"There is nothing in the *Tate Case* to show that the car was the place where the bet was completed. The contrary is implied.

"\* \* \* There was no claim or showing [in *Sill*] that any bet was perfected in the automobile. While the owner of the car was transporting the mutuel bet slips, the bets very evidently were not yet accomplished. It is fair to deduce that the automobile was merely used for the purpose of bringing about a bet.

\* \* \*

"In the instant case, it is likewise apparent that the telegraph office was used in connection with gambling, and such use was an indispensable part in the consummation of this type of gambling transaction. The property was an 'essential tool' used for the purpose of gambling, and clearly falls within the purview of the statute.

\* \* \*

"\* \* \* As to the offense of gambling, it is very apparent that the use of a vehicle in gambling is an accessory use and the vehicle is not the place where the completed offense occurs. It is necessary to conclude that the legislature intended the words 'used for the purpose of' to include both meanings, *i.e.,* used to bring about an effectuated purpose and used in pursuance of a purpose not as yet, if ever, effectuated.

"The inclusiveness of the meaning of the words 'used for the purpose of' is illustrated in the 2 cases, *People ex rel Wayne Prosecuting Attorney v Sill* and *People ex rel Wayne Prosecuting Attorney v Tate, supra.* The meaning which the Chief Justice would exclude, has been recognized, used and applied by us in those 2 cases hereinbefore noted. The statute does not recite that the purpose must have become fulfilled or effectuated." *Western Union, supra,* pp 96-98.

The Court responded:

"Mr. Justice REID, in writing that the 2 telegraph offices here involved were 'used for the purpose of gambling', cites *People ex rel Wayne Prosecuting Attorney v Tate,* 306 Mich 667; *People ex rel Wayne Prosecuting Attorney v Sill,* 310 Mich 570; and *People ex rel Wayne Prosecuting Attorney v Bitonti,* 306 Mich 115. In each of those cases an automobile, used, as an 'essential tool' and vital link in a gaming operation, to transport mutuel betting tickets, was held to be a nuisance, subject to seizure and sale. This was corollary to the provisions of 1948 CL 750.306; MSA 28.538, declaring the gambling paraphernalia contained in the vehicles to be a common nuisance and their possession a misdemeanor. The distinction is clear. In the instant case the allegations of the bill fail to make out not only a case of gambling in defendant's offices but also of possessing anything there which may not lawfully be possessed. \* \* \* At greater variance therewith is the suggestion that the transportation, by defendant public carrier in interstate commerce, of money, which it is still

In *Western Union* it was sought to padlock a
telegraph office on the ground that it had been
"used for the purpose of",[5] "in connection with" or
to facilitate or effectuate the condemned activity
(gambling) elsewhere. An order of abatement was
reversed although Western Union "knew" and
"acquiesced"; it conceded that it transmitted daily
over its wires offers to wager and money for wa-
gers and pay-offs. This Court nevertheless held
that because the condemned activity (gambling)
did not entirely occur in the telegraph office and,
in contrast with the automobile cases (where the
drivers had betting slips in the car), the *proprietor*
possessed nothing which it might not lawfully
possess, the office could not be padlocked.

The concern manifested in *Western Union* for
protecting the interests of persons not participat-
ing in the condemned activity appears also in
*Maynard's Petition* [6] where the Court concluded
that cigarette and candy vending machines and
their contents owned by another were not subject
to seizure for violation of the liquor laws by the
owner of the premises where they were located.
The Court declared that neither *Sill* nor *Martin* [7]
supported seizure on the theory that the presence
of such machines contributed to the violation of
the liquor laws by adding to the convenience of the
customer. The Court saw no "relation" between
their presence and the illegal sale of liquor.

The cases appear to fall into two general cate-
gories. The first category consists of those cases

lawful to possess in Michigan, from this State to points outside the
State, for placing there as bets, may be restrained by our courts or
defendant's places of business used in connection therewith declared
nuisances, subject to abatement." *Id.,* pp 90-92.

[5] See fn 13, *infra,* for this statutory language, and fn 4, *supra,* for
the argument of the dissenters in *Western Union* based thereon.

[6] *In re Maynard's Petition,* 333 Mich 543, 546; 53 NW2d 370 (1952).

[7] See fn 3.

where the condemned activity is engaged in solely by a person in lawful possession *(e.g.,* as owner, lessee, bailee) of the property—the automobile cases, *Sill, Tate, Bitonti,* and *Martin,* and the prostitution case, *Robinson.* [8] The second category consists of those cases where unlawful activity is engaged in by patrons of what, except for that activity, is generally a lawful business—the telegraph office in *Western Union,* a dance hall in *Schoonmaker,* [9] and a resort in *Harding.* [10]

When the claim made is in the first category there is no need, under the statute[11] and the cases,[12] to prove knowledge or participation by the owner of the property sought to be seized or padlocked. Where, however, it is sought to padlock a legitimate business because of the activities of patrons, the Court has required proof of knowledge and some degree of participation by the owner in condemned activity by patrons *on his premises.*

In *Schoonmaker* where, as here, it was sought to padlock a place open to the public based on activity of patrons, the Court declared that the people must show that the proprietor's "use bears a participating relation" to activities of patrons *on his premises* condemned by the padlock act, and concluded that it had failed in that burden. The Court's analysis that the liquor was "not used in the dance hall but secreted by patrons outside of the hall" where it was consumed, is inconsistent

---

[8] *State ex rel Attorney General v Robinson,* 250 Mich 99; 229 NW 403 (1930).

[9] *People v Schoonmaker,* 241 Mich 177; 216 NW 456 (1927).

[10] *People ex rel Allegan Prosecuting Attorney v Harding,* 343 Mich 41; 72 NW2d 33 (1955).

[11] "Proof of knowledge of the existence of the nuisance on the part of the defendants or any of them, is not required." MCL 600.3815(2); MSA 27A.3815(2).

[12] *People ex rel Wayne Prosecuting Attorney v Sill* and *State ex rel Wayne Prosecuting Attorney v Martin, supra.*

with the view that although the condemned activity is committed off the premises a public place can nevertheless be padlocked, to say nothing of predicating padlocking on ancillary activity of patrons offering or agreeing to go outside to commit the condemned offense.

In *Harding*—the only reported case in the 60-odd year history of the statute[13] where a public place was padlocked based on the activities of patrons—there was evidence that the owner not only "acquiesced" but participated in the condemned activity by himself encouraging his employees to supply his underage customers with intoxicating liquor in his unlicensed establishment, and that customers were encouraged to engage, and had engaged, in the condemned activity by possessing and consuming intoxicating liquor on the premises.

---

[13] The material language of the statute took its present form in 1919 PA 112, amending the original red light abatement act, 1915 PA 272, as amended by 1917 PA 337. The statute was re-enacted without material change as 1925 PA 389. See 1915 CL 7781; 1929 CL 9093; 1948 CL 692.251; MCL 600.3801.

The pertinent provision of the currently operative statute reads:

"Any building, vehicle, boat, aircraft or place used for the purpose of lewdness, assignation or prostitution or gambling, or used by, or kept for the use of prostitutes or other disorderly persons, or used for the unlawful manufacture, storing, possessing, transporting, sale, keeping for sale, giving away, bartering, furnishing or otherwise disposing of any narcotic and/or hypnotic drug as defined by law or of any vinous, malt, brewed, fermented, spirituous or intoxicating liquors or any mixed liquors or beverages, any part of which is intoxicating, is hereby declared a nuisance and the furniture, fixtures and contents of any such building, vehicle, boat, aircraft, or place and all such intoxicating liquors therein are also declared a nuisance, and all such narcotic and/or hypnotic drugs and nuisances shall be enjoined and abated as hereinafter provided, and as provided in the court rules. Any person, or his servant, agent or employee who shall own, lease, conduct or maintain any building, vehicle or place used for any of the purposes or by any of the persons above set forth or where any of the acts above enumerated are conducted, permitted or carried on, is guilty of a nuisance." MCL 600.3801; MSA 27A.3801.

The argument of the dissenters in *Western Union* based on the words "used for the purpose of" appears in fn 4, *supra.*

The "kept for the use of" clause is adverted to in part III, *infra.*

It is unprecedented to padlock a public place based on ancillary activity of patrons less than the completed offense condemned by the padlock act. Today's decision is not compatible with the history of disposition under the act.[14]

---

[14] In *Schoonmaker,* the Court, in reversing an order padlocking a dance hall based on patron consumption of alcoholic beverages, declared:

"The proofs may be said to show *illegal acts* by some persons attending the dances, but that is not enough. Defendants did not maintain a nuisance unless they permitted such *illegal use* of the premises; * * *.

"It seems to us that the statute denounces a place where persons are permitted, either expressly or impliedly, or by connivance, such as furnishing aid or accessories to resort there for the purpose of drinking intoxicating liquors. * * * One inviting the public to his place for commercial purposes must take care not to invite or acquiesce in transgressions of the law. That transgressions may happen is possible, but remain offenses of the wrongdoer unless tolerated by the occupant to the extent of permissive use of the premises for such purpose or indifference thereto. The statute does not deprive one person of the use of his property by reason of the illegal acts of another, unless the owner's use bears a participating relation to the violation.

\* \* \*

"Intoxicating liquor was *not used in the dance hall but secreted by patrons outside of the hall* and secretly visited." *Schoonmaker, supra,* pp 181-182.

In *Harding,* where the principal claim was that intoxicating liquor was provided to minors, the Court analyzed the case as follows:

"[T]here was testimony that at least half of the customers were drinking intoxicating liquor, and that minors who were drinking intoxicating liquor in the place were observed by the defendants without objection, some of them being high school or college students. * * * The defendant George Harding, Jr., was intoxicated in public, in the place, on numerous occasions. On 1 occasion, at least, he furnished liquor to a minor waiter and drank with him. One of the waiters, a minor, at the suggestion of defendant George Harding, Jr., and with his permission, sold whiskey in the place. It was customary for a waiter to negotiate a sale of a pint of whiskey, accept $5 from a customer in the place, and then either go, or direct the purchaser to go, to a parked car outside in the parking lot where the liquor was kept. There was testimony that whiskey was sold on the premises by waiters, with the knowledge of the defendant George Harding, Jr. When 1 of the waiters asked permission of George Harding, Jr. to purchase whiskey for a customer, Harding told him 'Yes, any way to make a buck.' The minor then sold a fifth of whiskey to the customer. A number of pints of whiskey were sold on the premises by waiters at $5 a pint.

\* \* \*

## II

The Court, by ignoring altogether its earlier pertinent decisions, having avoided grappling with the inconsistency of its disposition, proceeds to announce an untenable definition of the term "place of assignation".

To be sure, the terms "lewdness", "assignation" and "prostitution" have differing meanings. Many assignations do not involve prostitution.

The history of the red light abatement acts, however, sustains the consistent construction in this and other jurisdictions that the acts were designed to abate nuisances at houses or places where sexual acts occur; such abatement acts have been applied solely to commercial sexual activity.[15]

"The place had a bad reputation in the community for lewdness and assignation. There was testimony tending to show lewdness in talk on the dance floor, suggesting assignations in the adjacent rooms. These rooms had the customary equipment of hotel bedrooms.

\* \* \*

"We conclude that the evidence adduced by the appellant establishes that the place was a nuisance under the statute. It was used for possessing intoxicating liquor, and for the use of disorderly persons." *Harding, supra,* pp 45-47.

[15] "The Michigan statute is one of a number of 'red light abatement acts', enacted in the early 1900s to subject houses of prostitution to abatement as nuisances. The Iowa act, passed in 1909, served as a model for similar legislation in at least two other states.

"These acts have been applied consistently to houses of prostitution. In 1914, the Nebraska Supreme Court held that evidence that acts of prostitution had occurred at a hotel was insufficient to support a finding that the hotel was a nuisance under the Nebraska statute. *[State ex rel English v Fanning,* 97 Neb 224; 149 NW 413 (1914).]

\* \* \*

"The Michigan abatement statute has been applied to houses of prostitution.

\* \* \*

"The Washington Supreme Court similarly declared that the Washington statute was 'directed to the abatement of \* \* \* houses of lewdness, assignation, or prostitution' and held that it could not be used to padlock a hotel that was not a house of prostitution. *[State ex rel Carroll v Gatter,* 43 Wash 2d 153, 160; 260 P2d 360 (1953).]" *State*

Even if one ignores that history, one cannot properly read place of assignation[16] to mean the place where the agreement for an assignation is made rather than the place where the agreed upon meeting for the agreed upon purpose is to occur.

The dictionary definitions recited by the Court do not support its conclusion. "[A]n appointment * * * for a meeting"[17] is, as *Webster's Third New International Dictionary Unabridged* explicitly states, the "time and place" where the meeting is to occur. The Court apparently reads "an appointment of time and place" as if it were "appoint*ing* a time and place", concluding that the "*making* of an appointment" is itself an assignation.

Just as the place where a contract is to be performed and the place where it is entered into are generally different places, so, too, the appointed place for an assignation will often be a place other than the place where the appointment was made, *e.g.*, such an appointment may be made by telephone or on a street corner.

---

*ex rel Wayne County Prosecutor v Diversified Theatrical Corp,* 396 Mich 244, 246-248; 240 NW2d 460 (1976).

[16] "[A]ssignation house. A house of prostitution that caters to the well-to-do. Cf. house of assignation.

"* * * 1882 Buel *Metropolitan Life Unveiled,* [p] 167, 'The assignation houses of Washington are sustained almost wholly by members of the two houses of Congress.' 1943 Ottley *New World,* [p] 28, 'Don't come * * * bothering me with any more protests about assignation houses until you can bring concrete evidence of such houses.' " 1 A Dictionary of Americanisms on Historical Principles (University of Chicago Press, 1951), p 47.

[17] "[A]n *appointment* of time and place *for a meeting* [especially] for illicit sexual relations." *Webster's Third New International Dictionary Unabridged* (1966 ed), p 132 (emphasis supplied).

"[A]n *appointment for a meeting,* [especially] a lover's secret rendezvous; a lover's tryst." *The Random House Dictionary of the English Language: The Unabridged Edition* (1969 ed), p 90 (emphasis supplied).

"[Assignation] is defined as meaning an *appointment* of time and place *for meeting* or interview; used chiefly of love interviews and now commonly in a bad sense." 6A CJS, Assignation, p 582 (emphasis supplied).

The place where the appointment for sexual purposes is agreed upon is a place of assignation only if the sexual act as well as the agreement is to or does occur at the same place. Where the agreement appoints another place for the sexual act, that place alone is the place of assignation; the mere agreement is not an assignation.

Further, accosting and soliciting, on which the Court's finding of assignation is based, is not, even in the Court's lexicon, assignation.

In apparent appreciation that its strained construction may invite application in contexts other than offering sex for money—*e.g.*, persons meeting at work, a neighborhood or singles bar or some other location and agreeing to meet immediately or at another time at some place to engage in noncommercial sexual activity—the Court inconstantly turns full circle, acknowledges that the legislative purpose was to abate the use of premises and places for prostitution, and creatively limits "assignation" to agreements involving prostitution to avoid the prohibition of "innocent" conduct which is "of the nature of assignation".

In *Harding* the Court used the terms "lewdness" and "assignation" correctly:

"The place had a bad reputation in the community for lewdness and assignation. There was testimony tending to show *lewdness in talk* on the dance floor, *suggesting assignations in the adjacent rooms.* These rooms had the customary equipment of hotel bedrooms." *People ex rel Allegan Prosecuting Attorney v Harding*, 343 Mich 41, 46-47; 72 NW2d 33 (1955) (emphasis supplied).

In sum, even if the term place of assignation is not limited—by the consistent construction of the red light abatement acts—to a place where sexual

acts are committed in a commercial setting, it is—
as a matter of ordinary English usage—the place
of the appointment for sexual purposes, not the
place where the appointment is made.

## III

I have considered whether the clause *"kept for
the use* of prostitutes or other disorderly persons"[18]
constitutes a separate basis for padlocking bars
which include, among their patrons, prostitutes
and their customers.[19] To so conclude might re-

[18] No claim is made that Anderson's Gardens is a mere front for
prostitution. The trial judge found:

"Now this establishment itself is located in a building approxi-
mately 30 × 90 feet. The bar itself is approximately 76 feet in length.
There are two television sets, a juke box, a shuffle board and an air
hockey game during a part of the time period involved herein. There
are approximately 38 tables located in the bar. Live music is offered
in the evening and signs were posted from time to time to discourage
table hopping, solicitation and loitering. Aside from liquor, beer and
other drinks, the bar offers sandwiches and chili to its customers. It is
a busy bar.

"Its patrons include persons from many economic and ethnic seg-
ments of our society. From elderly persons, electricians, union busi-
ness agents, salesmen, accountants and vendors, to a few students,
lawyers, bankers, truck drivers and policemen, on and off duty, all
frequent Anderson's Gardens. Some bring their spouses for an eve-
ning out. Over the years defendant Levenburg developed friendships
with some police officers who would socially visit the bar. These police
officer friends would be encouraged to visit the bar by the Levenburgs
for safety purposes. In fact, as an accommodation for customers,
including police officers, the bar management would cash pay checks.
And, in turn, to offer protection to the public, the police at the local
precinct would personally accompany Mr. Levenburg laden with cash
to and from his bank on a regular basis. Most witnesses described the
bar as a noisy, very friendly bar which gives excellent service and
gives good food and drink, and so it is. It is, in addition, a safe bar
inside.

"However, it also has the reputation of a bar where one can meet
and pick up prostitutes. It was rated by one officer as one of the top
five bars in Detroit where prostitutes hang out."

[19] In *Garrison v Menendez*, 158 So 2d 856 (La App, 1963), the
employees of the night club solicited patrons to purchase "champagne
at the price of $60.00 per bottle, the price to include sexual inter-
course, either naturally at the females' apartment or elsewhere, or
unnaturally (per os) at the rear booths of the club itself". *Id.,* p 860.

quire defining the word "use" as including ancillary activities other than completed acts of prostitution, gambling or illegal traffic in intoxicants, contrary to the history of disposition under this statute.

Since the Court does not rest decision on this clause of the padlock act and the trial judge in *Levenburg* made no finding that Anderson's Gardens was a place *"kept for* the use of prostitutes" and the record does not, in contrast with *Harding,* show that the owners here were themselves involved directly or through their employees in providing the illicit supply to their customers, there is no need in this dissenting opinion to consider whether the statute authorizes padlocking where, as in the cases from other jurisdictions cited by the Court to support its definition of "assignation",[20] the owner is involved in providing the

___

In *State v Baldino,* 11 NJ Super 158, 160; 78 A2d 95, 96 (1951), the proprietor "offered two girls to them for the purpose of illicit sexual intercourse for a stated price". In *People v Bayside Land Co,* 48 Cal App 257, 259; 191 P 994, 995 (1920), the opinion is unclear whether the proprietor provided prostitutes to customers or simply "encouraged" their presence.

*Garrison* and *Bayside* were decided under red light abatement acts and *Baldino* under another statute.

Because no sexual act occurred on the premises, Baldino's conviction was reversed, the court stating that *perhaps* he could have been convicted under other language of the statute.

In *Garrison* sexual acts were performed on the premises.

In *Bayside,* the only case where a court padlocked a place based on solicitation on the premises for sexual acts off the premises, the proprietor may have provided women on the premises or at least "encouraged" their presence. The court did not say that the place where the solicitation and agreement was entered into was a place of assignation; rather, it said that the investigators had there *"made* an assignation to repair to the other place where rooms might be obtained". It spoke of the "assignation *made* on the premises" and of the "assignation so *made",* thereby recognizing the distinction between making an assignation (the agreement) and the assignation itself (the appointed time and place for the meeting), a distinction which this Court ignores, despite its favorable citation of *Bayside.* (Emphasis supplied.)

[20] See fn 13 for text of statute.

illicit supply which may be availed of off the premises.

BLAIR MOODY, JR., J., took no part in the decision of these cases.