STATE OF IOWA v. JOHN MITCHELL, Appellant.

**Conspiracy:** EVIDENCE. On this prosecution for conspiracy to induce two girls of previous reputed chastity to commit the crime of lewdness, the evidence is held sufficient to support conviction.

**Same:** LEWDNESS: INSTRUCTION. The term lewdness as used in the Code, section 4938, has reference to such open and public indecency as tends to corrupt the public morals, and not merely an unlawful indulgence of animal desires. So that under an indictment for conspiracy to induce females to commit the crime of lewdness, and there was no evidence of illicit intercourse, or of more than a conspiracy to procure assent to a single act of intercourse, an instruction charging lewdness to be the unlawful indulgence of animal desires was misleading and erroneous.

*Appeal from Polk District Court.*—HON. JESSE A. MILLER, Judge.

MONDAY, NOVEMBER 21, 1910.

THE defendant was convicted of the crime of conspiracy, and, appeals.—*Reversed.*

*W. A. Spurrier* and *Marion B. Seevers,* for appellant.

*H. W. Byers,* Attorney General, and *Chas. W. Lyon,* Assistant Attorney General, for the State.

LADD, J.—The defendant and Joe Manning were jointly indicted for the crime of conspiracy; it being charged that they combined and confederated together to induce two females, theretofore reputed to have been virtuous, to meet them at Des Moines with the intent to cause said females to commit the crimes of adultery and lewdness and to become prostitutes. The defendant on separate trial was convicted, and on appeal insists that the evidence was insufficient to sustain the finding of the jury. It appears that defendant was a sort of an actor connected with Readings Carnival in June, 1909, and while at Jefferson became acquainted with Carrie Sprague, little more than fourteen years of age. Upon departing he left his address, and the girl wrote to him. Twelve or fifteen letters were exchanged, in many of which she addressed him as "Dear Hubby" and he her as "Dear Wife." In one of these he related that he was going home (Des Moines) to write a sketch, and wanted to knew if Carrie and her friend, a sixteen-year-old girl, whom he had met at Jefferson, would be the girls. He had told her while there that "he and Joe Manning were going to start a show and we (Carrie and Bertha) could go on the stage," and that, if the girls came, he and Manning would buy their clothes and support them. Later, when Carrie supposed the play had been prepared, she wrote defendant for $5. and said she would come to Des Moines. He sent her the money, and, in acknowledging her reply, wrote in part:

*1. CONSPIRACY: evidence.*

You will get into Des Moines at about 8:15, Joe and I will be there; we will have on white sweaters and cap. I thank you very much for the lock of hair. I wish I had your pitcher. Now tell your pal I said hello and give this letter to her. Tell her Joe sent it wright right back, and let me know if you received the money order. I am

just dying to see your sweet face. I am sorry I had you worried any time. Any time I say anything, sweetheart, you can bank on it, that I mean it. Honey, you can get anything from me that your heart desires, for I love you, baby, and there isnt another girl that can take your place in my heart, kid. I am writing this letter Wd. 20, and it will come over the N. W. R. R. and you will get it Thus. evening. Well kid I dont know nothing else to say only I hope to see your sweet Sat. Good bye, from your dear husband to his sweet little wife. P. S. Excuse bad writing and misspelled words. Take all mistakes as kisses. S. W. A. K.

The girls reached Des Moines as proposed shortly before nine o'clock in the evening, and Manning met them at the depot and led the way to the Family Theater, where they remained until the close of the performance. The defendant and Manning escorted the girls to the Oxford Hotel, where defendant gave Carrie a dollar, and directed them to procure a room, and in doing so to register under fictitious names, which they did. The girls having returned, Manning motioned them from across the street to follow, which they did, and Mitchell overtook them. Carrie testified: "We went down one track or crossing. Did not go over the covered bridge. When we were walking, whenever they thought there were any police, they would tell us to walk ahead or behind them." The parties walked arm in arm, defendant with Carrie and Manning with Bertha, save when separated, down the railway tracks several blocks, and were seen by a policeman south of the railway tracks several blocks from their hotel at about twenty minutes after eleven o'clock p. m. The policeman shadowed them, and, as they returned toward the hotel, inquired of the girls what they were doing and where they belonged, and being told that they hailed from Jefferson, took the four to the police station. When it is added that the girls were white and the defendant and Manning colored, that the latter was a married man, and that the girls expected to stay

with these men, little more is necessary. They were taken in custody none too soon to obviate the consummation of their evident purpose. The defendant's letters together with his proposition that the girls go on the stage, and that he and Manning would buy their clothes and support them, indicates with sufficient certainty his design in inducing them to come to Des Moines, and, if his declarations as testified to are to be believed, Manning had combined with him in promoting his scheme. It may be that after meeting them in Des Moines no indecent suggestions were made, but, owing to the vigilance of the police, no opportunity inducing these had been afforded. That the girls may have been willing victims to the allurements of the promised life on the stage, even though involving a life of shame with persons of another race, constituted no defense if the conspiracy to induce the girls to commit one of the offenses named in the indictment existed. The evidence was sufficient to carry the case to the jury.

II. In the ninth instruction, the court defined lewdness as "the unlawful indulgence of the animal desires." The definition was inadequate, and, as applied to the facts in the case, misleading. Thereunder defendant must have been convicted if the conspiracy was to procure the girls' willing presence for the purpose of a single act of intercourse. That this would not have constituted lewdness appears from *State v. Marvin,* 12 Iowa, 499, and *State v. McDavitt,* 140 Iowa, 342. See, also, *State v. Kirkpatrick,* 63 Iowa, 554. In *State v. Toombs,* 79 Iowa, 741, and *State v. Wilson,* 124 Iowa, 264, the definition is approved, but in both cases the offense being considered was that of "keeping a house of ill fame, resorted to for the purpose of prostitution or lewdness." Section 4939, Code. The gist of the offense under that section is the keeping of the place for the purpose defined, and the term "lewdness," as therein found, is employed in its ordinary sense as meaning lustfulness,

2. SAME:
lewdness:
instruction.

lecherous, lascivious, or libidinous conduct. The distinction was noted in *Commonwealth v. Lambert,* 12 Allen (Mass.) 177, where the court rejected the contention that in a similar statute the word means open and public indecency, as the common-law offense, and held that it included "illicit sexual intercourse and the irregular indulgence of lust whether public or private." It may not import criminal indulgence (*Snow v. Witcher,* 31 N. C. 346, and *Brooks v. State,* 10 Tenn. 482), but is generally used as indicating gross indecency with respect to the sexual relations. On the other hand, the term "lewdness" as found in the indictment charging defendant with conspiracy to cause these girls to commit the crime of lewdness had reference to the statutory crime of that name defined in section 4938 of the Code, reading: "If any man and woman, not being married to each other lewdly and viciously associate and cohabit together, or if any man or woman, married or unmarried, is guilty of open and gross lewdness, and designedly makes an open and indecent or obscene exposure of his or her person, or of the person of another, every such person shall be imprisoned in the county jail not exceeding six months, or be fined not exceeding two hundred dollars."

Under the evidence, the inquiry was whether the design of defendant and Manning was that these girls "lewdly and viciously associate" with them or other males. This, as said, would not be established by showing a conspiracy to procure them to yield their persons to a single act of incontinence, but the design must have been to cause or induce each girl to lewdly or viciously associate or cohabit for some time with one of the defendants or other male person. The design of the statute is to prevent evil and indecent examples tending to corrupt the public morals. *State v. Marvin, supra.* Because of the error pointed out, the judgment is reversed and the cause remanded—*Reversed.*