STATE OF MICHIGAN *ex rel* WAYNE COUNTY PROSECUTING
ATTORNEY v DIZZY DUCK

Docket Nos. 134045, 136610. Submitted April 20, 1993, at Detroit.
Decided January 18, 1994, at 9:20 A.M. Leave to appeal sought.

The State of Michigan, on the relation of the Wayne County
Prosecuting Attorney, brought an action in the Wayne Circuit
Court against Dizzy Duck, an adult entertainment establish-
ment; Boyce J. Maxwell; and Greenfield Eight Restaurant
Company, Inc., seeking, pursuant to MCL 600.3801 *et seq.*;
MSA 27A.3801 *et seq.*, to have the defendants' establishment
declared a nuisance and the premises padlocked. The prose-
cutor alleged that the following activities that occurred at the
Dizzy Duck were abatable: nude dancing, "lap dancing," the
"Fantasy Room," and assignation for prostitution. The court,
Richard C. Kaufman, J., declined the request to padlock the
premises, but entered an order enjoining those activities that it
found to constitute a nuisance: lap dancing and assignation for
prostitution. The prosecutor thereafter moved that the trial
court find the defendants in contempt because the lap dancing
was continuing at the Dizzy Duck. The court denied the motion,
but issued an order to clarify its earlier order by including the
following language in the prohibition against lap dancing: "and
where the main purpose of contact is for masturbation of the
male penis." The prosecutor appealed from the trial court's
original and amended orders, and the defendants cross ap-
pealed. The appeals were consolidated.

The Court of Appeals *held:*

1. Nude dancing where there is no contact between the
dancer and the customer does not constitute prostitution or a
related activity of lewdness or assignation and is not abatable
under MCL 600.3801; MSA 27A.3801.

2. The term "prostitution," as used in MCL 600.3801; MSA
27A.3801, refers to the performance of sexual intercourse for
hire.

3. The term "lewdness," as used in MCL 600.3801; MSA

REFERENCES

Am Jur 2d, Nuisances §§ 192, 326, 356; Prostitution §§ 1, 2, 6.
See ALR Index under Nuisances; Prostitution.

27A.3801, refers to those sexual acts of a nature similar to sexual intercourse: anal intercourse, fellatio, cunnilingus, and masturbation performed on another and where done for hire.

4. The trial court correctly determined that lap dancing does not constitute lewdness unless it is done for the purpose of masturbation. The court properly ascertained what aspects of the lap dancing constituted an abatable nuisance and enjoined those aspects.

5. The activity that occurred in the "Fantasy Room," masturbation performed by a customer on himself while watching a dancer, who sometimes masturbated, does not come within the definition of lewdness. There was no masturbation performed for hire on the customer. The dancer's conduct, which does not materially differ from the nude dancing that was performed on stage, is not abatable under MCL 600.3801; MSA 27A.3801.

6. The trial court correctly determined what aspects of the activities at the Dizzy Duck constituted "lewdness, assignation or prostitution" under MCL 600.3801; MSA 27A.3801 and were thus abatable.

7. The trial court did not abuse its discretion in choosing to enjoin the nuisance rather than closing the establishment. Where, as in this case, the abatable activities constitute only a portion of the conduct and the business can continue to operate with the abatable conduct enjoined, the trial court may limit its remedy in the first instance to enjoining the prohibited conduct.

Affirmed.

CORRIGAN, J., dissenting, stated that the evidence establishes that the Dizzy Duck was a house of prostitution, lewdness, or assignation under MCL 600.3801; MSA 27A.3801 and should be padlocked. The conclusion of the trial court and the majority regarding the scope of abatable conduct is too narrow and the remedy fashioned by the trial court is inadequate to cure the proven nuisances, including acts of assignation, lap dancing, nude dancing, and masturbation for hire that occurred in the Fantasy Room. Prostitution is properly defined as the conduct of all persons, male and female, who engage in sexual activity as a business. The statute is intended to regulate morality and does not foreclose a nuisance remedy with regard to on-stage exhibitions of masturbation. There is no need to distinguish acts of prostitution from acts of lewdness in order to resolve this case. Nude dancing is subject to regulation under the statute where, as in this case, it is substantially connected to and related to prostitution. The trial court's more specific order regarding the lap dancing did not adequately remedy the proven harms. Prostitution includes the offering or receiving of

the body, in return for a fee, for acts of vaginal intercourse, anal intercourse, fellatio, cunnilingus, masturbation, or physical contact with a person's genitals, pubic area, buttocks or breasts, and does not exclude other acts of sexual conduct offered or received for pay. Lewdness should not be limited to sexual acts other than sexual intercourse done for hire. The activities in the Fantasy Room amounted to lewd live conduct associated with prostitution. Manual stimulation of oneself in the presence of another for hire is activity proscribed by the statute because it is a sex act of whatever nature performed for money. Actual physical contact between the participants is not required.

1. NUISANCE — NUDE DANCING — LEWDNESS, ASSIGNATION, OR PROSTITUTION.

   Nude dancing where there is no contact between the dancer and the customer does not constitute prostitution or a related activity of lewdness or assignation and is not abatable under the nuisance abatement statute (MCL 600.3801; MSA 27A.3801).

2. NUISANCE — WORDS AND PHRASES — "PROSTITUTION."

   The term "prostitution" as used in the nuisance abatement statute refers to the performance of sexual intercourse for hire (MCL 600.3801; MSA 27A.3801).

3. NUISANCE — WORDS AND PHRASES — "LEWDNESS."

   The term "lewdness" as used in the nuisance abatement statute refers to those sexual acts of a nature similar to sexual intercourse: anal intercourse, fellatio, cunnilingus, and masturbation performed on another where done for hire (MCL 600.3801; MSA 27A.3801).

4. NUISANCE — ABATEMENT OF NUISANCES — INJUNCTIONS — PADLOCKING OF PREMISES.

   It is not an abuse of discretion for a court to enjoin conduct that constitutes a nuisance that occurs in a business establishment rather than closing the business where the abatable activities constitute only a portion of the conduct at the business and the business can continue to operate with the abatable conduct enjoined (MCL 600.3801; MSA 27A.3801).

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Andrea Solak,* Chief, Special Operations, and *Larry L. Roberts,* Assistant Prosecuting Attorney, for the plaintiff.

*Rubin & Rubin* (by *Carl L. Rubin*), for the defendants.

Before: HOLBROOK, JR., P.J., and SAWYER and CORRIGAN, JJ.

SAWYER, J. This action arises out of the Wayne County Prosecutor's complaint to have defendants' establishment declared a nuisance under MCL 600.3801; MSA 27A.3801 and the premises padlocked. Although the trial court found that some of the activities at the Dizzy Duck constituted a nuisance, it declined the prosecutor's request to padlock the premises. Instead, the trial court enjoined those activities that it found to constitute a nuisance. The prosecutor now appeals and defendants cross appeal.[1]

"Dizzy Duck" is an assumed name registered by defendant Greenfield Eight Restaurant Company, Inc. Defendant Boyce J. Maxwell is the incorporator, president, resident agent, and owner-operator. The Dizzy Duck is a small establishment located in Detroit, where patrons pay an entrance fee for admission, which offers adult entertainment, such as nude dancing.

Six police officers gave testimony concerning an undercover investigation and subsequent raid on the Dizzy Duck. Four employees of the Dizzy Duck also testified; three of them were dancers and were granted immunity. There were four activities that were investigated: nude dancing, "lap dancing," the "Fantasy Room," and assignation for prostitution.

Concerning the nude dancing, there was a stage area for individual and group female nude danc-

---

[1] Although defendants did cross appeal, they did not file a separate brief on cross appeal, nor do they seek modification of the trial court's order. Their brief on appeal does, however, to some extent argue that the trial court's order is overly broad.

ing. There was also a plexiglass shower enclosure on stage for "shower dances" where patrons would pay extra to see a dancer shower.

For a fee of $20 for one song, or $30 for two songs, the female employees would perform a "lap dance" for a customer. During these lap dances a dancer would straddle a customer's legs and move herself about the customer's legs and groin area while holding onto either the customer or a pair of handles mounted on the wall. Although some touching of dancers by patrons was observed, an employee hired for security testified that it was a rule that customers were not supposed to "get too friendly" with their hands during lap dances.

The women also solicited to take the men back to the Fantasy Room, which was in a more secluded area of the building. For a fee upwards of $65, customers would be placed in a room opposite one of the dancers, where they could see each other through a plexiglass partition. The women would then dance and sometimes masturbate, while the men watched. The women encouraged the men to masturbate along with them while in the Fantasy Room. Evidence technicians found sperm in samples taken from the fantasy room walls and plexiglass partition.

There was also testimony by the police officers that while on the premises the dancers would solicit for acts of prostitution to occur off the premises. One of the dancers also testified that solicitation for prostitution occurred at the Dizzy Duck and she had done so herself. She explained that if the dancers paid their manager enough money, they "could get away with anything," including leaving with a customer. Another employee who was hired for security testified that the rules of the Dizzy Duck prohibited prostitution or solicitation for prostitution. However, there was

some evidence that the owner knew about his dancers' soliciting for prostitution because at least one of the dancers made complaints to him about different treatment in letting certain women leave with customers.

The trial court found that lap dancing and assignation for prostitution were occurring at the Dizzy Duck, and that they were abatable nuisances under MCL 600.3801 *et seq.*; MSA 27A.3801 *et seq.* The trial court entered an order to this effect on September 26, 1990, which ordered the lap dancing and assignation abated. The order also provided for periodic reasonable inspections of the Dizzy Duck by Detroit police officers to ensure compliance. Then, on November 2, 1990, the prosecutor moved that the trial court find defendants in contempt because the lap dancing was continuing at the Dizzy Duck. The trial court denied the contempt motion. However, the trial court went on to clarify its earlier order by including the following language in the prohibition against lap dancing: "and where the main purpose of contact is for masturbation of the male penis." The trial court entered an amended order including the above language.

On appeal, the prosecutor essentially advances two arguments: that the trial court was too narrow in its conclusion of what activities constituted a nuisance under the statute and that the trial court should have closed the Dizzy Duck rather than merely enjoining those activities that constitute a nuisance. We disagree with both those propositions.

We turn first to the question of what conduct is abatable under the statute. MCL 600.3801; MSA 27A.3801 declares as nuisances, inter alia, buildings used "for the purpose of lewdness, assignation or prostitution." The trial court found that two

activities at the Dizzy Duck come within the statute: soliciting acts of prostitution and lap dancing where "the main purpose of contact is for masturbation of the male penis." The prosecutor argues that all lap dancing, the nude dancing in general, and the Fantasy Room activities are all abatable conduct under the statute. Indeed, the prosecutor seems to suggest that any conduct "designed to commercialize sex" is abatable under the statute. Like the trial court, we disagree.

The question whether nude dancing is abatable is easily answered: it is not. The Supreme Court considered the applicability of the nuisance statute to adult movie theaters in *State ex rel Wayne Co Prosecutor v Diversified Theatrical Corp,* 396 Mich 244; 240 NW2d 460 (1976), concluding that it did not. The Court reached the conclusion that the abatement statute applies only to houses of prostitution:

> We are in accord with decisions applying these abatement statutes only to houses of prostitution. The meaning of the words "lewdness, assignation or prostitution" is clear in light of the history and purpose of these statutes and that meaning cannot properly be expanded by judicial construction. [*Id.* at 250.]

We see no meaningful basis to distinguish between live entertainment and film. As *Diversified* makes clear, the focus is not on whether the entertainment may be judged to be obscene, but whether it constitutes prostitution or related activities. Nude dancing, where there is no contact between the dancer and the customer, simply does not constitute prostitution or a related activity of lewdness or assignation.[2] Accordingly, like the adult films at

---

[2] The meaning of the terms "lewdness" and "assignation" as used in the statute will be discussed in more detail *infra.*

issue in *Diversified,* nude dancing is not abatable under the statute. See also *State ex rel Saginaw Prosecuting Attorney v Bobenal Investments, Inc,* 111 Mich App 16; 314 NW2d 512 (1981) (live nude dancing not abatable as lewd under the statute).

However, the issue whether lap dancing and the Fantasy Room activities constitute prostitution or lewdness may not be disposed of quite as easily. The nuisance abatement statute does not define the meaning of either "prostitution" or "lewdness." The prosecutor urges us to accept a very broad definition of those terms. We do not.

*The Random House College Dictionary, Revised Edition* (1984), defines "prostitution" as "the act or practice of engaging in sexual intercourse for money." Similarly, Black's Law Dictionary (5th ed), defines "prostitution" as "performing an act of sexual intercourse for hire, or offering or agreeing to perform an act of sexual intercourse or any unlawful sexual act for hire." Corpus Juris Secundum defines it as "the practice of a female offering her body to an indiscriminate intercourse with men," usually for hire. 73 CJS, Prostitution and Related Offenses, § 2, p 250.

This Court did give a somewhat broader definition of prostitution in *State ex rel Macomb Co Prosecuting Attorney v Mesk,* 123 Mich App 111; 333 NW2d 184 (1983), concluding that prostitution included "manual stimulation of another person for the payment of money." *Id.* at 118. In reaching that conclusion, the *Mesk* Court relied upon a decision of the North Carolina Court of Appeals in *State ex rel Gilchrist v Hurley,* 48 NC App 433, 443; 269 SE2d 646 (1980), which defined prostitution to include "vaginal intercourse, anal intercourse, fellatio, cunnilingus, masturbation, or physical contact with a person's genitals, pubic area, buttocks or breasts." The decision in *Mesk*

notwithstanding, we view that as an overly broad definition of prostitution. Rather, we think the commonly accepted definition is that which was intended: the performance of sexual intercourse for hire.[3]

However, our inquiry does not end there. The nuisance abatement statute addresses not just prostitution, but lewdness as well. This definition is somewhat more difficult to reach. As noted in *Diversified, supra* at 250, n 13, the term "lewdness" has generally been viewed as being broader than the term "prostitution." Nevertheless, as the Supreme Court made clear in both *Diversified* and in *State ex rel Wayne Co Prosecuting Attorney v Levenburg,* 406 Mich 455, 466; 280 NW2d 810 (1979), the term "lewdness" must be defined in a manner that is consistent with the rule of *noscitur a sociis.*[4] Thus, while "lewdness" may have a broader meaning than "prostitution," its definition is nevertheless limited by reference to the definition of "prostitution." See also *State ex rel Wayne Co Prosecuting Attorney v Bennis,* 200 Mich App 670; 504 NW2d 731 (1993).

---

[3] This does not mean, of course, that the Legislature could not choose to define prostitution more broadly. Rather, in the absence of a statutory definition, we use the accepted "dictionary" definition of the word. See *People v Troncoso,* 187 Mich App 567, 573; 468 NW2d 287 (1991). In fact, we note that the criminal prostitution statutes refer to both "prostitution" and "lewdness." See MCL 750.448 *et seq.*; MSA 28.703 *et seq.* This reflects that the Legislature was cognizant of the narrow meaning of the word "prostitution" and it therefore included "lewdness" to give coverage to sexual acts done for hire other than just sexual intercourse.

[4] Black's Law Dictionary (5th ed), p 956, defines this to mean:

It is known from its associates. The meaning of a word is or may be known from the accompanying words. Under the doctrine of "noscitur a sociis," the meaning of questionable words or phrases in a statute may be ascertained by reference to the meaning of words or phrases associated with it.

See also *Levenburg, supra* at 466-467, n 8.

In determining the meaning of "lewdness," we note the direction in *Levenburg, supra* at 464-465, that each of the terms used, lewdness, prostitution, and assignation, be given its own distinct meaning in order to effectuate the Legislature's intent. Accordingly, we conclude that "lewdness" must cover a broader range of acts than just sexual intercourse, though, as pointed out in *Diversified, Levenburg,* and *Bennis,* it must be an act for hire.

In determining exactly what acts come within the meaning of "lewdness," we are again guided by the rule of *noscitur a sociis.* "Lewdness" must be defined by reference to "prostitution" and the fact that the focus of the nuisance abatement statute is to abate prostitution and not all conduct that may be considered to offend the public morals. See *Levenburg, supra,* and *Diversified, supra.* That is, it cannot mean any generally lewd act performed for hire. In *Diversified,* the patrons presumably paid a fee to watch the movie at issue. Thus, the focus of *Diversified* was not on the "for hire" or commercial aspect of the conduct, but upon the nature of the act involved. Furthermore, this conduct must be of the same general class of activities associated with prostitution. See *Diversified, supra* at 250, n 13. Indeed, as the trial court noted, an unduly broad definition of lewdness will bring within the statute conduct the Legislature simply did not intend to be covered.[5]

---

[5] The trial court commented on the fact that ordinary dancing may involve some contact between the genital areas, albeit the participants are clothed. Of course, this would not come within the scope of the statute because the "for hire" aspect is missing. However, it does point to the problem. What, for example, is to be said of the old-fashioned kissing booth at the county fair? A broad definition of sexual activity could be said to encompass kissing. Would payment therefore constitute an abatable nuisance under the statute? We don't think that is the sort of conduct envisioned to come under the provisions of the statute. Clearly, there must be some limitation to the scope of the term "lewdness."

In this respect, we believe that the trial court arrived at a reasonable conclusion in the case at bar with respect to the lap dancing: it constituted "lewdness" only if it was done for the purpose of masturbation. Prostitution involves sexual intercourse, which *The Random House College Dictionary, Revised Edition* (1984), defines as "genital contact, esp. the insertion of the penis into the vagina followed by ejaculation; coitus; copulation." Accordingly, in order to define "lewdness" in conjunction with "prostitution," we conclude that "lewdness," as used in the nuisance abatement statute, refers to those sexual acts of a nature similar to sexual intercourse: anal intercourse, fellatio, cunnilingus, and masturbation performed on another where done for hire.

With the above definition of lewdness in mind, we can conclude that the trial court reached the correct result in addressing the lap dancing. Lap dancing itself does not constitute lewdness unless it is done for the purpose of masturbation.[6] The trial court did enjoin any lap dancing "where the main purpose of contact is for masturbation of the male penis." The trial court properly ascertained what aspects of the lap dancing constituted an abatable nuisance.

This leaves the issue of the Fantasy Room. Although masturbation apparently did occur within the Fantasy Room, it was not performed on the customer by the dancers. Rather, it was performed by the customer on himself while watching a dancer. Thus, there was no masturbation performed for hire. Accordingly, it does not come within the definition of lewdness set forth above. In terms of the conduct of the dancer in the Fantasy Room, that conduct does not materially

---

[6] *Random House* defines "masturbation" as "the stimulation or manipulation of one's own or another's genitals to achieve orgasm."

differ from the nude dancing that was performed on stage and that, as discussed above, is not abatable under the statute.[7]

For the above reasons, we conclude that the trial court correctly determined what aspects of the activities at the Dizzy Duck constituted "lewdness, assignation or prostitution" under the statute and were thus abatable. There remains, however, the prosecutor's argument that the trial court should have padlocked the Dizzy Duck rather than merely enjoining the nuisance. It is within the discretion of the circuit court to choose a remedy less drastic than padlocking the building, such as enjoining the activities that constitute a nuisance. *People ex rel Wayne Prosecuting Attorney v Sill*, 310 Mich 570, 576; 17 NW2d 756 (1945); *People ex rel Attorney General v Holschuh*, 235 Mich 272, 274-277; 209 NW 158 (1926).

We have no dispute with the trial court's exercise of its discretion in this case. The trial court chose to enjoin the nuisance rather than closing the establishment, noting as follows:

> Given the nature of other legal activities, no matter what the Court or others personal beliefs as to their moral conduct, the assignation and the lap dancing would be unlawful conduct, does not seem so pervasive to the Court nor is the Court persuaded at this point that those cannot be prevented with an order short of one, [sic] padlocking the Dizzy Duck.

We agree with the trial court. As noted above, the focus of the nuisance abatement statute is to close bordellos. While abatable activity occurred on the premises of the Dizzy Duck, it is not a bordello.

---

[7] For that matter, the conduct of a customer in the Fantasy Room does not materially differ from that of a patron of a movie theater who chooses to masturbate while watching a movie in the theater.

Where, as here, the abatable activities only constitute a portion of the conduct and the business can continue to operate with the abatable conduct enjoined, it is eminently reasonable for the trial court to limit its remedy in the first instance to merely enjoining the prohibited conduct rather than closing the establishment. If the prohibited activity persists despite the injunction, the trial court can certainly reconsider the issue and padlock the premises as the only effective means of abating the nuisance. However, as long as defendants are willing to obey the injunction, we see no reason to require the premises to be padlocked. Certainly, the trial court did not abuse its discretion in choosing to try the less restrictive remedy first.

Finally, we wish to briefly comment on a point raised by the dissent. Contrary to the dissent's suggestion, our efforts here are not an "attempt to fashion a new definition of prostitution and lewdness not heretofore recognized in Michigan." *Post* at 276. Rather, we seek only to define those terms properly in light of both the statutes and the constitutional restrictions enunciated in the precedents of both this Court and the Supreme Court. Our goal is not new definitions, but merely to clarify the existing ones. Further, we believe our dissenting colleague is unnecessarily concerned that our opinion elevates the burden of proof in the enforcement of prostitution, or impedes enforcement of the abatement statute. Rather, if we have been even partially successful in clarifying the scope of the statute, enforcement should be made more efficient because it will be clearer to bench, bar, and the law enforcement community exactly what activity is properly considered within the purview of the statute. Expansion of the abate-

ment statute, as proposed by the dissent, is best left to the Legislature.

Affirmed. Defendants may tax costs.

HOLBROOK, JR., P.J., concurred.

CORRIGAN, J. *(dissenting).* After reviewing the whole record, I dissent from the majority opinion affirming the circuit court's injunctive orders.

At the conclusion of the trial, the circuit court ordered the lap dancing and assignations abated, but declined to hold nude dancing or the masturbatory activity done for hire in the Fantasy Room abatable activity. In subsequent proceedings, the court also declined to hold defendants in contempt for continuing the lap dancing. Instead, the court amended its previous order to prohibit lap dancing where "the main purpose of contact is for masturbation of the male penis." The conclusion of the circuit court and the majority regarding the scope of abatable conduct is too narrow. In light of the whole record, the court should have immediately padlocked the premises.

Exercising the independent judgment called for by a standard of review de novo, I conclude that the remedy fashioned was inadequate to cure the proven nuisances, including acts of assignation, lap dancing, nude dancing, and masturbation for hire that occurred in the Fantasy Room on defendants' premises. I would order the circuit court to padlock the premises pursuant to MCL 600.3801; MSA 27A.3801. At the time of the complaint in this action, that statute provided in pertinent part:

> Any building, vehicle, boat, aircraft or place used for the purpose of lewdness, assignation or prostitution or gambling, or used by, or kept for the use of prostitutes or other disorderly persons

. . . is hereby declared a nuisance and . . . shall
be enjoined and abated as hereinafter provided.

A public nuisance is a condition or use of prop-
erty that greatly offends or interferes with public
health, morals, or decency. *Bloss v Paris Twp,* 380
Mich 466; 157 NW2d 260 (1968); *Garfield Twp v
Young,* 348 Mich 337; 82 NW2d 876 (1957). Stat-
utes and ordinances regulating prostitution, a spe-
cies of laws regulating public morals, are within
the police powers. Michigan's interest in protect-
ing societal order, health, safety, and morality in
places of public accommodation would be fur-
thered by padlocking this proven nuisance.

Cognizant of my duty to apply controlling prece-
dent, I reject as mistaken a theme repeated in
many cases, most recently in *State ex rel Wayne
Co Prosecuting Attorney v Bennis,* 200 Mich App
670, 676; 504 NW2d 731 (1993), that the red light
abatement act is not intended to regulate moral-
ity. See also, e.g., *State ex rel Wayne Co Prose-
cutor v Diversified Theatrical Corp,* 396 Mich 244,
247; 240 NW2d 460 (1976). The obvious intent
underlying the statute is to regulate morality.
There is no constitutional flaw in regulating mo-
rality, absent some specific constitutional prohibi-
tion. See the concurring opinion of Justice Scalia
in *Barnes v Glen Theatre, Inc,* 501 US —; 111 S Ct
2456, 2465; 115 L Ed 2d 504, 517 (1991).

[T]here is no basis for thinking that our society
has ever shared that Thoreauvian "you - may - do
- what - you - like - so - long - as - it - does - not -
injure - someone - else" beau ideal—much less for
thinking that it was written into the Constitution.
The purpose of Indiana's nudity law would be
violated, I think, if 60,000 fully consenting adults
crowded into the Hoosierdome to display their
genitals to one another, even if there were not an

offended innocent in the crowd. Our society prohibits, and all human societies have prohibited, certain activities not because they harm others but because they are considered, in the traditional phrase, "*contra bonos mores*," i.e., immoral. In American society, such prohibitions have included, for example, sadomasochism, cockfighting, bestiality, suicide, drug use, prostitution, and sodomy. While there may be great diversity of view on whether various of these prohibitions should exist . . . there is no doubt that, absent specific constitutional protection for the conduct involved, the Constitution does not prohibit them simply because they regulate "morality."

The testimony of the various undercover Detroit police officers, together with the physical evidence seized from the premises, established that the Dizzy Duck *was* a "house of prostitution, lewdness or assignation" under the act. Certain sexual activities on the premises reflect a 1990s-style commitment to "safe sex." For example, male customers who engaged in sexual activity remained clothed. Further, sexual behavior in the presence of others was usually autoerotic—albeit for hire. This 1990s version of debased, degrading, and licentious conduct is nonetheless the type of conduct that the people historically have chosen to abate as acts of prostitution or lewdness. In my view, prostitution is the conduct of all persons, male and female, who engage in sexual activity as a business. The prosecutor correctly points out that "allowing deviations of prostitution to occur because there are no extant cases on point is error when the facts adduced support the claim of nuisance."

I dissent from the majority's effort to define prostitution as *only* acts of sexual intercourse for hire and lewdness as certain listed sexual acts, other than sexual intercourse, for hire. Our precedents do not compel these new definitions of very

old terms. I also fear that these narrowed definitions could breed serious problems in future civil enforcement efforts.

The most serious obstacle presented by the majority opinion is its exclusion of on-stage exhibitions of masturbation from the reach of the red light abatement act. Although persons who masturbate openly on stage may be subject to criminal prosecution, under the majority's newly announced definitions of prostitution and lewdness, no action can be taken against the property where such behavior takes place. In my view, the language used in the statute does not foreclose a nuisance remedy for such behavior.

Next, the majority's effort to distinguish acts of prostitution from acts of lewdness could result in the unnecessary elevation of the burden of proof in the context of the criminal enforcement of prostitution offenses. Under current practice, the prosecutor need not prove the exact nature of the sexual activities purchased. The majority's construction will permit an objection for failure to allege whether an act of prostitution or an act of lewdness has been committed, and may require further specificity in proof.

We do not need to draw a bright line distinction between the terms "prostitution" and "lewdness" in order to resolve this case. Our former cases have never done so. The terms "prostitution" and "lewdness" certainly historically have had overlapping elements and will continue to do so.

A decision construing the terms "lewdness" and "prostitution" to apply to autoerotism for hire will not send us careening down a slippery slope that will condone the padlocking of kissing booths at county fairs. (See p 259, n 5.) I cannot imagine a Michigan prosecutor who would waste scarce resources on such folly. On the other hand, if the

acts proven on this record occurred at a county fair in Michigan, a prosecutor who failed to act would either be recalled or unceremoniously booted out of office at the earliest available opportunity.

I

ASSIGNATION AND NUDE DANCING

The circuit court correctly held that acts of assignation occurred on the premises as defined in *State ex rel Wayne Co Prosecuting Attorney v Levenburg,* 406 Mich 455; 280 NW2d 810 (1979), remanded on other grounds 407 Mich 1147 (1979). The court, however, failed to consider these proofs within the totality of circumstances. The assignations did not occur in isolation; the various activities proven at trial were done to further prostitution and in connection with prostitution.

I dissent from the majority's discussion of the principles governing the regulation of nude dancing and their application to this case. Nude dancing at the Dizzy Duck frequently involved lewd live stage exhibitions outside the First Amendment's ambit. For example, some nude dancers openly masturbated on stage. One dancer bent over and separated her buttocks to let a customer blow into her anus; another dancer sprayed breast milk on the assembled crowd.

Relying on *State ex rel Saginaw Prosecuting Attorney v Bobenal Investments, Inc,* 111 Mich App 16; 314 NW2d 512 (1981), the majority flatly posits that nude dancing cannot be regulated under the red light abatement act. See also *State ex rel Oakland Co Prosecuting Attorney v Alray Northcrest Plaza,* 146 Mich App 595; 381 NW2d 731 (1985). Nude dancing is not beyond regulation. The complaints in *Bobenal* and *Northcrest* were

ruled defective because they failed to connect the nude dancing to prostitution, lewdness, or assignation. These defects are not present here, because the complaint alleged and the proofs established that nude dancing was substantially connected to and related to prostitution. For example, testimony revealed that one dancer lay on the stage, spread her legs, and displayed her genitals to excite the customers and encourage the purchase of lap dances.

In this regard, I would adopt the views of Justice Souter in *Barnes v Glen Theatre, supra,* and the views of Judge Coffey in *Miller v Civil City of South Bend,* 904 F2d 1081 (CA 7, 1990) (rev'd sub nom *Barnes v Glen Theatre, supra,* in the Supreme Court). In *Miller,* Judge Coffey stated:

> Not only does nude dancing in and of itself degrade women, its elimination is particularly important because of its close association with a more devastating example of sexual exploitation of women, prostitution. The link between nude dancing, prostitution and other sexual crimes is well established. It is common knowledge that prostitution is a likely result in a situation where live performers sexually stimulate an audience and there often exists the probability of audience access to these performers for the performance of sexual activities. . . . We need go no further than our own cases to discover that nude dancing and prostitution are partners coupled not only logically and historically but also in empirical, present-day reality. We can properly take judicial notice that in no fewer than three of our decisions in the past two years prostitution operations have been based in nude dancing establishments. See *United States v Marren,* 890 F2d 924, 926 (7th Cir 1989) ("Michael's Magic Touch served alcoholic beverages and entertained patrons with nude female dancers who, when not performing on stage, solicited the club's patrons to engage in sexual activities in

rooms located above the club"); *United States v Doerr,* 886 F2d 944, 949 (7th Cir 1989) ("The prostitution activities . . . were concentrated in three businesses that . . . were nude dancing establishments. . . ."); *United States v Muskovsky,* 863 F2d 1319, 1322 (7th Cir 1988) (Prostitution operation based in nude dancing establishment where customers were enticed to purchase "very expensive drinks . . . in exchange for sexual favors"). . . . Furthermore, in *California v LaRue,* 409 US 109, 111; 93 S Ct 390, 393; 34 L Ed 2d 342 (1972), now Chief Justice Rehnquist described the prostitution and other sexual activities accompanying nude dancing that motivated a ban on nude dancing in California:

"Customers were found engaging in oral copulation with women entertainers; customers engaged in public masturbation; and customers placed rolled currency either directly into the vagina of a female entertainer, or on the bar in order that she might pick it up herself. Numerous other forms of contact between the mouths of male customers and the vaginal areas of female performers were reported to have occurred.

Prostitution occurred in and around such licensed premises, and involved some of the female dancers. Indecent exposure to young girls, attempted rape, rape itself, and assaults on police officers took place on or immediately adjacent to such premises." [904 F2d 1111 (Coffey, J., dissenting).]

No opinion in *Barnes, supra,* elicited a majority vote. Nevertheless, the opinion held that nude dancing can be regulated under the state's public indecency statute. In *Barnes, supra,* Justice Souter concluded that the Indiana public indecency statute satisfied the four-part inquiry of *United States v O'Brien,* 391 US 367; 88 S Ct 1673; 20 L Ed 2d 672 (1968), in part because Indiana's interest in preventing prostitution, sexual assaults, and associated crimes was furthered by forbidding nude

entertainment. He also opined that a state's interest in banning nude dancing results from a simple correlation of nude dancing with other evils, such as prostitution and sexual assault. As a matter of fact, on this record, and as a matter of law, nude dancing was related to prostitution.

Finally, the majority misreads the *Diversified* case by asserting that there is no distinction between live stage acts and film portrayals.[1] The *Diversified* Court saw the distinction between live behavior and film as crucial. See, e.g., 396 Mich 246 ("We conclude, however, that the statute was intended to apply to houses of prostitution and not motion picture theatres where sexual acts are not committed but are portrayed on the screen"), and 396 Mich 250, n 12. For these reasons, I do not join the majority's opinion on nude dancing.

## II

### LAP DANCING

For prices of $20 or $30, depending on whether a customer purchased one or two songs, a dancer clad in a G-string would straddle a clothed customer's lap and thrust back and forth. The dancers would occasionally grab customers' penises through their pants in order to solicit lap dances.

---

[1] Perhaps in this respect the majority could be said to share the observations of Professor Catharine MacKinnon, if not her opinion about the ultimate remedies:

> Is nude dancing a "representation" of eroticism or is it eroticism, meaning a sex act? How is a live sex show different? In terms of what the men are doing sexually, an audience watching a gang rape in a movie is no different from an audience watching a gang rape that is reenacting a gang rape from a movie, or an audience watching any gang rape.

MacKinnon, *Only Words* (Cambridge, Mass: Harvard University Press, 1993), p 28. These are not the views of our Supreme Court.

In a lap dance, sexual contact, through clothing, took place between the females' genitals and the males' groins. The management even provided hand grips on the walls of the Dizzy Duck so the dancers could make their movements more forceful. Some customers would either fondle or suck the women's bare breasts and grab the women by their buttocks for improved thrusting. Customers occasionally ejaculated, sometimes before and sometimes after the lap dance was finished.

In its first ruling, the court ordered that acts of lap dancing be abated. When evidence was adduced during the contempt proceeding that lap dancing continued despite the order, the court merely modified the order to direct that acts of lap dancing for the purpose of masturbating the male penis were to be enjoined. The majority affirms the circuit court's decision to deny abatement of lap dancing, except as described in the order. In my view, this more specific order did not adequately remedy the proven harms.

The amended order is essentially unenforceable. The prosecutor's efforts to prove the parties' intent would certainly be met with assertions of the Fifth Amendment privilege against compelled self-incrimination. The amended order serves no real purpose, other than to elevate the burden of proof without justification.

Lap dancing is sexual stimulation of another for hire and involves actual physical contact. Unlike my colleagues, I would adopt the broad definition of prostitution described in dicta in *State ex rel Macomb Co Prosecuting Attorney v Mesk*, 123 Mich App 111, 118; 333 NW2d 184 (1983). Even Black's Law Dictionary (5th ed), cited by the majority, alternatively describes prostitution not only as sexual intercourse, but also the performance of any unlawful sexual act for hire. Accordingly, the

sexual acts the majority defines as "lewd" also fall within the legal definition of prostitution. Moreover, the majority's decision to define lewdness as "sexual acts done for hire other than just sexual intercourse," *ante,* p 258, n 3, is not the common understanding of the term.

I think it is quite probable that the Legislature that adopted the red light abatement act in 1915 meant the term "lewdness" to describe the activities of a male involved with a female prostitute. For example, in *State v Rayburn,* 170 Iowa 514; 153 NW 59, 60 (1915), a contemporary opinion rendered at the time of the enactment of the Michigan statute, the court construed the term "lewdness" to describe the activities of the male actor.

> If "prostitution" and "lewdness" are synonymous, it would have been unnecessary to have used but one of the words. There was presumably some reason for using both. . . . If a man and woman go together to or resort to a house of ill fame for the purpose of having sexual intercourse, her purpose would be for prostitution, his for lewdness. Or a man could go by himself for the purpose of having sexual intercourse, which would be lewdness under this statute and under definitions hereafter given. Or a man could resort to such a place, and be guilty of lewdness without sexual intercourse. Lewdness may not import criminal indulgence, but is generally used as indicating gross indecency with respect to the sexual relations. *State v Mitchell,* 149 Iowa 362, 366; 128 NW 378 [1910]. Sexual intercourse would, of course, constitute lewdness, but, as suggested, there may be lewdness without sexual intercourse at all, and the man, as well as the woman, may be guilty of it.

*Webster's Third New International Dictionary,*

*Unabridged Edition* (1964), defines lewdness as the "quality or state of being lewd." Lewd, in turn, is defined as "sexually unchaste or licentious"; "inciting to sensual desire or imagination." Licentious behavior is, in turn, behavior "marked by the absence of legal or moral restraints," that which is "hostile or offensive to accepted standards of conduct." Construing the word "lewdness" with the aid of a dictionary, I cannot join the majority's newly announced definition.

I do endorse the definition of prostitution in *State ex rel Gilchrist v Hurley*, 48 NC App 433, 443; 269 SE2d 646 (1980), cited but not adopted in *Mesk*:

> We hold that prostitution plainly includes the offering or receiving of the body, in return for a fee, for acts of vaginal intercourse, anal intercourse, fellatio, cunnilingus, masturbation, or physical contact with a person's genitals, pubic area, buttocks or breasts. *We hasten to add that our cataloguing of these acts of sexual behavior is not intended to exclude other acts of sexual conduct offered or received for pay.* [Emphasis added.]

See also *State v McKee*, 442 A2d 440 (RI, 1982), where the court affirmed a conviction of receiving and pandering for prostitution. The defendant had hired an undercover police woman to work as a masseuse in his massage parlor. He informed her that she could earn $500 to $1,000 a week more by doing "extra" work, including performing acts of masturbation and fellatio on the customers. However, sexual intercourse would be prohibited under the house rules. The court, *id.* at 443, rejected the defendant's contention that the definition of prostitution was limited to sexual intercourse for hire:

> [T]he sexual acts that defendant described to

Detective Mirando did in fact constitute "prostitution." This finding is well supported by logic as well as by law. The defendant's definition of "prostitution" would exclude all sexual acts but that associated with reproduction.[4] This is an absurd construction of the applicable statutes which contain no such limited definition of the offense of prostitution.

---

[4] The defendant's reliance on Black's Law Dictionary, 4th Edition, is also misplaced, for, as the state notes in its brief, the 5th Edition of that work includes "any unlawful sexual act for hire" in its definition of "prostitution." Black's Law Dictionary, 1100 (5th Ed, 1979).

---

See also *Commonwealth v Bucaulis,* 6 Mass App 59, 66; 373 NE2d 221 (1978), holding that the term "sexual intercourse" properly includes the act of fellatio.

The term "sexual intercourse" has commonly been employed to describe a variety of sexual conduct, including the act of fellatio. See G L c 265, §§ 22, 23; *Commonwealth v Gallant* [373 Mass 577, 584; 369 NE2d 707 (1977)] (defining "natural" and "unnatural" intercourse under G L c 265, § 23). There is nothing before us which indicates that the act of fellatio was previously considered to be outside the scope of the statute. . . . We accordingly conclude that the defendant should have understood that his conduct was in violation of the statute.

In sum, unlike the majority, I do not read our precedents or the common understanding to limit the term "lewdness" to sexual acts other than sexual intercourse done for hire.

III

FANTASY ROOM

For prices ranging from $65 to $125, a customer

could purchase a trip to the Fantasy Room. The Fantasy Room, a small room in the back of the establishment, was divided by a plexiglass partition. A dancer would enter one side of the room; the customer entered the other. The dancer would then remove her clothing and masturbate in the customer's presence. She would also invite the customer to join her if he chose, by masturbating on the other side of the partition. Evidence technicians analyzed samples taken from the walls and the plexiglass room divider and detected the presence of semen.

The majority concludes, in reliance on *Mesk, supra,* that masturbation of oneself in the presence of another for hire is not prostitution or lewdness. In *Mesk,* this Court opined that the term "prostitution" includes manual stimulation of another person for the payment of money. The issue presented here was not before the *Mesk* Court. The *Mesk* decision does not foreclose automasturbatory acts for hire from the definition of prostitution or lewdness. In reaching its result, *Mesk* relied on *Diversified Theatrical Corp, supra. Diversified* in turn cited *Chicago v Geraci,* 30 Ill App 3d 699, 703; 332 NE2d 487 (1975). 396 Mich 250, n 13. *Geraci* noted that the term "lewdness" was broader than and inclusive of the term "prostitution." Lewdness refers to the same general class of activities normally associated with houses of prostitution. Such terms, said the *Geraci* court, are intended to designate and prohibit "sex acts of whatever nature which are performed for money." 30 Ill App 3d 703.

The activities in the Fantasy Room amounted to lewd live conduct associated with prostitution. Manual stimulation of oneself in the presence of another for hire is proscribed activity, because,

under *Diversified* and *Geraci,* it is a sex act of "whatever nature" performed for money. Nothing in our precedents requires that participants must engage in actual physical contact.

I dissent from the majority's attempt to fashion a new definition of prostitution and lewdness not heretofore recognized in Michigan. Michigan's cities must be permitted to call a halt to urban blight and contamination of their neighborhoods from red light districts. The people of the State of Michigan have declared their intent; the executive branch has moved to enforce that intent through legitimate means. All the process that is due, and then some, has been afforded the defendants in this state's courts. The remedy fashioned is inadequate to cure the harms.

I respectfully dissent.